# APPENDIX B

Steven J. Miller (SBN 031383)
IPath PLC
15333 North Pima Rd., Suite 305
Scottsdale, AZ 85260
Office (480) 300-6377
*steve@millerlawhelps.com*
Attorney for Plaintiff Square Entertainment LLC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Square Entertainment LLC,<br><br>Plaintiff,<br><br>v.<br><br>Activate Games Incorporated<br><br>Defendant. | Case No.: 2:24-cv-03261-JCG<br><br>**AMENDED COMPLAINT (FIRST) FOR DECLARATORY JUDGEMENT OF NONINFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1. This is an action for a declaratory judgement arising under the patent laws of the United States, Title 35 of the United States Code. Square Entertainment seeks a declaratory judgement that Square does not infringe Activate Games' U.S. Patent No. 11,511,171 ("the '171 Patent").

## PARTIES

2. Plaintiff Square Entertainment LLC ("Square") is a limited liability company organized and existing under the laws of the State of Arizona, headquartered at 15333 N. Pima Road, Suite 305, Scottsdale, Arizona, 85260, and having a principal place

of business at 469 North Denver Avenue, Loveland, Colorado, 80537. Square sells and maintains equipment and software for floor stepping game installations in gaming facilities.

3. Defendant Activate Games Inc. ("Activate") (Square and Activate collectively "the Parties") is a Canadian Corporation headquartered at Winnipeg, Manitoba, Canada. Activate operates gaming facilities that provide physically active, interactive gaming experiences for players.

## JURISDICTION & VENUE

4. This Court has subject matter jurisdiction of this action under 28 U.S.C. §1331 and §1338(a) in that it arises under the United States Patent Laws.

5. Activate is subject to this Court's specific personal jurisdiction because it conducts business in this Judicial District, has committed the acts complained of in this Judicial District, and has, in bad faith, caused injury to Plaintiff within this Judicial District by virtue of the intended and actual effects of making groundless and bad-faith accusations of patent infringement implicating Square Entertainment LLC. Those assertions have had a negative and harmful effect on Square, causing irreparable harm.

6. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§1391(c)(3) because Activate is a Canadian defendant not residing in the United States and thus may be sued in any judicial district. Activate is transacting, doing, and/or soliciting business in this Judicial District and elsewhere in the United States.

## ACTION

7. This is an action for a declaratory judgement pursuant to 28 U.S.C.A. § 2201, for the purpose of determining a question of actual controversy between the Parties as set forth below.

## FACTUAL BACKGROUND

Parties and General Subject Matter

8. Plaintiff Square Entertainment LLC ("Plaintiff" or "Square") and Defendant Activate Games, Inc. ("Defendant" or "Activate") (Plaintiff and Defendant collectively "the Parties") are entertainment businesses that install and maintain physically interactive arcade games, particularly floor stepping games.

9. Upon information and belief, Activate owns, manages, and franchises gaming facilities wherein Activate's games are installed in the United States, Canada, and elsewhere.

10. Square is the exclusive North American licensee of the Pixel(TM) Game System. Square markets, installs, and provides service support to gaming facility owners in the United States and Canada for the Pixel(TM) Game system.

11. The Pixel™ Game System is owned by SIP Lizenz-und Rechteverwaltungs UG (haftungsbeschränkt) (hereinafter "SIP"). SIP is a German company organized under the laws and Germany and located at Leipziger Chaussee 23 Magdeburg, 39120, Germany.

12. Owners and employees of Pixel Games GmbH ("Pixel") invented and developed the Pixel Game System. Pixel assigned ownership to all of its intellectual property associated with the Pixel™ Game System to SIP on December 29, 2023.

13. SIP licenses elements of the Pixel™ Game System to licensees globally, including exclusively to Square in North America.

14. Square sells equipment and controlling software for Pixel™ floor stepping games that are installed in gaming facilities, including the type of entertainment facilities that Activate operates. None of these facilities are owned by Square, SIP, or Pixel GmbH.

15. "Stepping games" refers to a game system played by one or more players on an array of floor tiles laid together to form a contiguous surface upon which the game is played. Certain elements are common to most, if not all, stepping games and have been in existence for at least twenty-five (25) years. In a typical game, each individual floor tile contains an internal light source and a sensor that detects when a player steps on the tile's surface. The light source receives a signal to illuminate the tile from below through the translucent (stepping) surface upon which the player steps or stands. The tiles are coupled to a central controller that conducts the game according to game rules encoded in a software algorithm. The controller (1) signals the light source to illuminate the tile; and (2) receives a signal from the tile's sensor detecting whether a player is stepping on the tile. Based on the game's software algorithm, the controller illuminates tiles in a prescribed order, cueing the player to step on an illuminated tile, and tracks player responses to score the game.

16. An expansive description of the state of the art with respect to stepping games is found in the "Background" section of SIP's pending patent application number PCT/US2024/032320, attached hereto as "Exhibit A."

The Controversy

17. On or about December 11, 2023, U.S. counsel for Activate delivered a letter to "Pixel Games" by email to sales@pxl-games.com. Activate's December 11 letter is attached hereto as "Exhibit B." In this letter, Activate expresses concern that "some of the technology incorporated into Pixel's products and services may infringe on Activate's issued and pending United States patents . . . [n]otably, Activate's '171 Patent, titled 'Interactive Floor and Amusement Systems and Methods Employing Same . . ..'' Activate states two reasons for the letter: first, seeking more information on Pixel's products to evaluate against Activates intellectual property ("IP"); and second, to seek assurances that Pixel is aware of Activate's IP and avoids infringement of all of Activate's U.S. IP. The '171 Patent is attached hereto as "Exhibit C."

18. Pixel GmbH was aware of the '171 Patent by at least May 1, 2023.

19. In light of claims recited in the '171 Patent, Pixel GmbH sought a legal evaluation and opinion on whether it's goods and services would infringe on Activate's '171 patent while determining whether to enter markets in North America, namely, the United States and Canada.

20. Pixel GmbH received an Opinion of Non-Infringement on June 1, 2023 (“Opinion”), a copy of which is attached hereto as “Exhibit F.” The Opinion concluded that Pixel’s Products do not literally infringe on any claims of the ‘171 Patent, at least because:

> Established law surrounding ‘means-plus-function” claiming in the U.S. limits the claim scope of independent claims 1, 9, and 14 reciting a ‘sensing system’ to the sole mechanism of ‘sensing’ disclosed in the specification and drawings of the ‘171 patent–a mechanical switch pressure sensor. Pixel’s products [d]o not incorporate a mechanical switch pressure sensor, or any pressure sensor, [within] the allowable scope of Activate’s [sensing] system. For at least this reason, claims 1, 9, and 14 do not read on Pixel’s Products. Therefore, Pixel’s Products do not infringe the ‘171 patent.”

21. On December 19, 2023, counsel for Plaintiff responded to Activate’s letter of December 11 stating:

> None of Pixel’s products, regardless of whether they have ever been sold, advertised for sale, manufactured within, or imported into in the U.S. infringe on any claims of the ‘171 patent. Pixel has previously advertised certain of its game systems and services for sale in the U.S., as you have noted. Pixel advises me that it is no longer doing so. I can assure you that Pixel respects the intellectual property rights of others, particularly those such as Activate who produce interactive game space installations.

22. Counsel for the International Association of Amusement Parks and Attractions (“IAPPA”) telephoned Philipp Hacker to advise that Activate sought to block Pixel from advertising its goods and services in a booth Pixel GmbH (“Pixel”) was to host on the expo floor during the 2023 annual IAAPA meeting in Orlando Florida during the week of November 13, 2023. In response, Pixel provided IAAPA excerpts of its Opinion Letter to IAAPA showing a considered legal opinion of noninfringement of the ‘171 Patent, after which IAAPA allowed Pixel to exhibit at the expo.

23. Out of an abundance of caution, Pixel GmbH had permanently ceased to advertise its products and service for sale in the United States following the November 2023 IAAPA meeting, specifically, by at least by November 20, 2023.

24. Square Entertainment LLC began actively marketing the licensed Pixel Game System to customers in the United States on or around February 1, 2024.

25. Square purchased a registration and is currently attending the 2024 IAAPA Convention in Orlando, Florida.

26. Square opened its booth on the IAAPA expo floor to the public at 10:00 a.m. Orlando time on Tuesday, November 29, 2024. By around 4:00 p.m., Square had collected contact information from an estimated thirty (30) interested participants whom Square considered strong sales leads.

27. Activate is present at the 2024 IAAPA Convention and is a platinum-level sponsor. Activate has a booth on the expo floor.

28. Upon information and belief, Activate knew weeks or months in advance that Square would be present on the expo floor at the IAAPA Convention from November 19 through November 22, 2024.

29. On or about October 31, 2024, Square received an email at "info@pixel-us.com" from "adam@therealescape.ca" stating "I thought there was a patent infringement on this from Activate Games??? Do they know you're sending this out? Does Iaapa legal know?" This email is attached hereto as "Exhibit D."

30. Upon information and belief, "The Real Escape Canada" is owned by Adam Schmit.

31. Adam Schmidt and Megan Schmidt are the co-owners of Activate Games, Inc.

32. Upon information and belief, based on the adam@therealescape.ca email noted above, Adam Schmidt received mail from a contact mailing list maintained by Square.

33. On or about November 18, 2024, Square received an email requesting a Pixel Games quote from "Ann Xiang" that included the message "I got a note that only the activate from Canada can sell the franchise to USA. How do you handle this?" The email is attached hereto as "Exhibit E."

34. Upon information and belief, Activate witnessed in person Square's exhibit booth on the IAAPA expo floor starting at least on Tuesday, November 19.

35. Upon information and belief, Activate made no attempt whatsoever in 2024 to contact IAAPA or Square, either directly or through counsel, at any time since the initial contact surrounding the letter from its U.S. counsel (Exhibit B) to inquire or express any concern about the sale or offering for sale of any of Square's goods or services Activate believed might infringe on any of Activate's U.S. patents, despite at least the evidence listed herein indicating that Activate had actual knowledge of Square's goods and services Activate alleges infringes its '171 Patent.

36. Upon information and belief, Activate waited until November 19 to register a complaint with IAAPA attempting to shut down Square's booth, despite evidence

suggesting that Activate knew that Square would be exhibiting at IAAPA at least by October 31, 2023.

37. Upon information and belief, Activate sought to inflict maximal harm to Square by intentionally waiting until nearly a full day after Square's booth was open to the public, rather than notifying IAAPA or Square at any time during the weeks prior to arriving at the IAAPA Convention on or before November 18, on November 18, or early during the day on November 19, thereby validating Activate's informal assertions in the market, including potential customers at the IAAPA expo, that Square's Pixel™ products were infringing Activate's patent(s).

38. The removal of Square's Pixel™ products, banners, signage, and other promotional material from the IAAPA Convention expo floor after customers, potential customers, and industry colleagues had seen Square's booth, viewed the banners/signage/promotional materials, viewed Square's goods and advertised services, and even played on Square's demo Pixel™ game floor from the expo will cause lost sales and irreparable negative publicity with Square's U.S. and other North American clients from Canada and Mexico.

39. Square estimates its initial direct and immediate consequential losses resulting from Activate's IAAPA complaint to be at least that shown in Table 1 below:

TABLE 1

| **ITEM** | **COST** |
|---|---|
| IAAPA Booth Registration | $45,000 |
| Pixel™ Floor Model | 35,000 |

| | |
|---|---|
| Shipping | $10,000 |
| Lodging | $3,000 |
| Airfare and Other Travel | $15,000 |
| Lost revenue (10 closed sales at show) | $400,000 |
| Lost revenue (10 closed sales @ 60 days) | $400,000 |
| **TOTAL** | **$923,000** |

40. Within the last three weeks, Square has received at least two emails from individuals presenting as potential customers asking about whether the Pixel™ products infringe Activate's patent(s).

41. Upon information and belief, Activate sought to damage Square's reputation and business by informing potential customers that the Pixel™ Game System sold by Square infringed on Activate's patent(s).

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment of Non-Infringement of the '171 Patent)

42. Plaintiff incorporates by reference and realleges each of the allegations set forth in paragraphs 1-41 above.

43. On November 29, 2022, the '171 Patent, entitled Interactive Floor and Amusement Systems and Methods Employing Same, was issued to Activate Games, Inc.

44. Upon information and belief, the inventors of the '171 Patent assigned all rights, title, and interests in the '171 Patent to Activate.

45. Activate has alleged that the Pixel™ Game System advertised and sold by Square infringes on the claims of the '171 Patent.

46. Activate has threatened, without a given date or court, ill-founded enforcement of its ’171 Patent against Square, including accusations, assertions, claims, and threats that Activate has directed towards Square that have resulted and continue to result in Square’s injury and irreparable harm.

47. The Pixel Game System does not infringe any of the claims of the ‘171 Patent, for at least the reason the Pixel product sold by Square employs a tunable capacitance sensor not enabled by the scope of disclosures of the ‘171 Patent, such that the Pixel products do not satisfy the limitation “a sensing system operable to detect presence of any participant atop any panel of the array.”

48. Square seeks a declaratory judgement from the Court that making, using, selling, offering for sale and/or importing the Pixel™ Game System licensed from SIP and its distributors, sales representatives, and the like, does not in any way infringe the ‘171 claims, including directly or indirectly, literally or under the doctrine of equivalents.

## SECOND CLAIM FOR RELIEF

## (Tortious Interference with Existing and Potential Business Relationship)

49. Square incorporates by reference and realleges each of the allegations set forth in paragraphs 1- 48, above.

50. Square has business relationships with third party vendors, customers, and distributors.

51. Upon information and belief, Activate knew of the existing business relationships of Square with third party vendors, customers, and distributors.

52. Activate, purposefully coveting Square's business relationships and desiring to divert existing and future Square customers to itself, aggressively and wrongfully sought to evict Square from the IAAPA Convention 2024 expo floor through a compliant made to IAAPA through counsel based upon bad faith assertions related to its patent.

53. The acts of falsely claiming patent infringement in Arizona and elsewhere throughout the United States where Square does its business, were and are designed, using improper means, to divert Square's present customers to Activate, to intimidate Square's existing and future customers, and to diminish Square's future sales. Upon information and belief, Square's customers and potential customers have been, and are being intimidated, causing them to refrain from purchases out of fear that Square will not be able to continue to sell and service its products.

54. Thus, Activate has unlawfully interfered with the existing and prospective business relationships of Square with third party vendors, customers and distributors using improper means.

55. Activate's interference was intentional, unjustified, and based on improper means.

56. Square has been damaged by such interference with existing and prospective business relationships.

57. Square has been irreparably harmed by Activate's tortious interference and will continue to be so irreparably harmed, unless enjoined by this Court.

**DEMAND FOR JURY TRIAL**

Square demands, Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury of any and all issues on which a trial by jury is available under applicable law.

## PRAYER FOR RELIEF

Therefore, Square prays for judgment as follows:

A. Declaring that the making, using, selling, offering for sale, and/or importing of the Pixel™ Game System products do not and never have infringed any claim of the '171 Patent, directly or indirectly, literally or under the doctrine of equivalents.

B. That Activate be preliminarily and permanently enjoined from its unlawful acts.

C. That Activate has tortiously interfered with Square's present and prospective business relationships, using improper means.

D. That Plaintiff be awarded damages, exemplary damages, attorney's fees and its costs of suit, and pre-and post-judgment interest on any money judgment.

E. For such other relief as the Court deems proper.

DATED this 20th day of November, 2024.

By: /Steven Jay Miller/

IPath, PLC
Steven J. Miller (SBN 031383)
Attorney for Plaintiff
15333 N Pima Rd. Suite 305
Scottsdale, AZ 85260
(480) 300-6377
sjmiller@ipathip.com

# EXHIBIT A

WIPO PCT The International Patent System

WORLD INTELLECTUAL PROPERTY ORGANIZATION

# PATENT COOPERATION TREATY (PCT)

This document was downloaded from WIPO's ePCT system on 20/11/2024 22:28:55 CET as a digitally signed PDF file using the following certificate:

O=World Intellectual Property Organization
EMAILADDRESS=pct.eservices@wipo.int
CN=INTERNATIONAL BUREAU OF WIPO
Signature algorithm: SHA256withRSA

Provided that Adobe Reader or equivalent software shows that the file is signed using that certificate and unchanged, the International Bureau of WIPO certifies that the PDF file is a true copy of the document as it appeared in its files on that date.

The document is described as follows:

| | |
|---|---|
| International application number: | PCT/US2024/032320 |
| Date of entry into IB file: | 27 June 2024 |
| Type of document: | Application Body as Filed |

The information available to the system which created this document is not sufficient to verify which pages in this document were contained in the international application as filed. Consequently, this copy is not intended for use as a priority document.

# INTERACTIVE GAME SYSTEM

## CROSS REFERENCE TO RELATED APPLCATIONS

**[0001]** This application claims the priority benefit of U.S. provisional application number 63/470,778 entitled "Interactive Game Installation," filed on June 2, 2023; International Design Registration reference number WIPO133803, filed on June 19, 2023 and issuing as Registration Number DM/232588; and International Design Registration reference number WIPO133810, filed on June 19, 2023 and issuing as Registration Number DM/232401, the enclosures each of which are incorporated in their entirety herein by reference.

## BACKGROUND

### Technical Field

**[0002]** The disclosures herein relate to interactive game room systems. Specifically, the disclosed invention relates to components for an interactive electronic game room installation within a home or commercial amusement center to create an immersive, interactive space wherein one or more participants (players) play a game by responding to cues from various components of the installed system.

### State of the Art

**[0003]** Recreational game systems having interactive stepping surfaces were first introduced in the late 1990s in Japan and America. Such dance or "stepping" games remain popular worldwide and have continued to evolve over the past 25 years. Variations of the original arcade-based games remain. Other systems have been developed for home use. Typically, these game systems are based on a 3 x 3 or larger array of floor tiles laid together to form a continuous floor surface upon which the game is played. Each individual tile contains an internal light source and a sensor that detects when a player steps on the tile's surface. The light source receives a signal to illuminate the tile from below through the translucent (stepping) surface upon which the player steps or stands. The tiles are coupled to a central controller that conducts the game. The controller (1) signals the light source to illuminate the tile; and (2) receives a signal from the tile's sensor detecting whether a player is stepping on the tile. Based on the game's

software algorithm, the controller illuminates tiles in a prescribed order, cueing the player to step an illuminated tile, and tracks the players responses to score the game.

**[0004]** More recently, the arcade game has been expanded to an "arcade room." Meaning the concept of a stepping game has grown to include a building space, such as an entire room. An interactive arcade room includes a tile array dimensioned to cover the room's entire floor. Along with the interactive floor, additional features having audible (sound) or visible (illuminated) player cues and sensors may be added to the walls or ceiling of the room space surrounding the player floor. Creation of a player floor covered entirely with interactive tiles, however, creates challenges. The tiles must be constrained (held together) on the floor space and cannot shift when stepped on by players during a fast-paced stepping game. An interactive room installation is substantially larger, more complicated, and more expensive than a movable arcade game unit. Consequently, an interactive room installation should be usable by adults and children of all ages and skill levels without having design limitations excluding physically small children and physically large adults.

**[0005]** Interactive floor tiles typically are held together in a variety of ways. In many instances, the walls of the room physically constrain the tiles resting upon the floor area by contacting the entire outer periphery of the tile array. In some systems, T-shaped connector strips are placed on the floor player surface around the periphery of each tile in a grid, thus holding the tile array together and resisting separation of the tiles from one another during vigorous play. In some systems the tiles are fixed in place by an adhesive to an elevated subfloor through which wiring and communication cables are housed. Building a subfloor to support the tiles, however, adds to the cost and complexity of the installation. Constraining the tiles within the area defined by walls allows for small movements of individual tiles in a large or non-rectangular room installation. Players step on surface T-strips and similar connectors forcefully, whereunder the exposed tile connectors are subjected to wear-and-tear and shear stress tending to loosen, dislodge, break, or otherwise degrade the system of tile connectors at the player surface to constrain and immobilize tiles in the array.

**[0006]** Tile sensors detect when a player is standing or stepping on a tile. Currently available tiles utilize mechanical pressure or piezoresistive pressure sensors for this function. Both have limitations. Mechanical sensors are subject to wear. Employing a robust mechanical sensor to mitigate against wear and mechanical damage cause by repeated running, jumping, or hopping on the tile surface decreases the sensitivity of detecting a player standing on the surface, particularly if the player is a child or small adult. Both mechanical and piezoresistive sensors require a fixed, minimum downward force to detect player contact with the tile, which is constant, regardless of whether the player is a nursery school child or a 300-pound football player. Moreover, mechanical sensors are subject to physical wear from friction, corrosion of exposed metallic parts in high-humidity environments, gradual loss of resilience in biasing components; i.e., springs, and other shortcomings.

**[0007]** Thus, there are multiple disadvantages to currently available tile systems for installation of a tile array in an interactive arcade room installation. An improved means of fixing tiles of an array, tile sensors not prone to physical degradation with repeated use over time, and a means of "tuning" a tile sensor to adjust for different the physical stresses generated by different sized players engaged in different levels of game play are needed.

<u>BRIEF SUMMARY</u>

**[0008]** Disclosed herein are example embodiments relating to an interactive room installation generally based on a dance or stepping arcade game. The interactive room installation is intended for use by children, teens, and adults of all sizes and play intensities. Electronic sensors in each tile comprising the play floor may be "tuned" to respond accurately to varied stepping frequencies dictated by the game being played, and by players of different weights. The installation dimensions are flexible, and many configurations of the play floor are possible. Individual floor tiles are coupled together beneath the play surface by robust connectors that remain completely protected well beneath a top surface of each tile to form a fixed, stable stepping surface where movement or dislodgement of individual tiles during vigorous play is extremely unlikely. The play floor may be installed on unfinished concrete, wood, or any other existing

properly supported stable floor surface. All components and electrical connections are contained within the tiles or along the play floor perimeter, therefore no subfloor is needed to conceal and protect electronics comprising the system.

**[0009]** A controller . . . Additional features are included in . . .

**[0010]** One or more different games may be programmed for play by a single player or simultaneously by more than one player (group play). In some embodiments, players may register an account using the game's software, whereunder data from the player's games is saved to a memory and player data can be tracked to measure the player's skill progression through playing multiple games over time. A player may progress stepwise through skill levels and receive awards related to the player's achievements, in some embodiments. Various elements of the interactive game installation overcome problems and deficiencies of the prior art, some of which are listed herein above.

**[0011]** Disclosed is an interactive game installation having an array of interactive tiles, each tile comprising a housing configured to contain internal components within a space defined by at least one side, a bottom, and a translucent top having an outside face forming a stepping surface and an inside face opposing the outside face. In some embodiments, a plurality of sides on each tile are joined together by a corresponding plurality of connection features configured to mate with a tile connector.

**[0012]** In some embodiments, the at least one side comprises a first surface orthogonal to the bottom and a second surface extending non-orthogonally (i.e., forming an angle less than about ninety degrees (90°) from a top aspect of the first surface to a rim having a recess configured to couple with the inside face of the top. In some embodiments, the non-orthogonal angle between the first surface and the second surface forms an overhanging shelf concealing the sides of the housing from the combined stepping surfaces formed by a plurality of tiles coupled together in an array. In some embodiments, the array measures about ten (10) meters by about five (5) meters. This is not meant to be limiting and many other dimensions are possible. In some embodiments, the at least one side contains a ventilation slot. In some embodiments, the at least one side contains a connector hole. In some embodiments, a logo is presented by the housing. In some embodiments, the logo is presented on the bottom of the housing. In some

embodiments, the logo is presented on the side of the housing. In some embodiments, the housing includes any one or combination of a mounting boss, a support peg, and a connection feature.

**[0013]** In some embodiments, the internal components comprise a capacitive sensor, a communication cable, and a power wire. In some embodiments, the capacitive sensor comprises a contact threshold that is tunable by a software program. In some embodiments, the internal components further comprise a light emitting diode (LED) mounted on a printable circuit board (PCB). In some embodiments, a plurality of LEDs comprising one or more light emission spectra (colors) are mounted on a single PCB disposed within the tile housing. In some embodiments, the housing comprises a support peg and a mounting boss. In some embodiments, the support peg and the mounting boss form a unitary body with the tile housing.

**[0014]** Also disclosed is a tile connector. In some embodiments, the tile connector is a unitary body having a feature complementary to a feature formed on a tile housing. In some embodiments, the feature is shaped like one component of a dovetail joint. In some embodiments, the component is configured as a male component. In some embodiments, the component is configured as a female component.

**[0015]** A game control system is also disclosed herein, whereunder illumination and sensing of an interactive tile array is directed and monitored by the control system. The control system comprises a microprocessor, a memory, a power source, a display, a user interface, and a plurality of signal pathways, in some embodiments. A software program comprising an algorithm for game play for one or more players resides on a readable memory and is executed by the microprocessor. The microprocessor is communicatively coupled to the sensor and the TILE PCB of one or more of the plurality of tile housings. The microprocessor commands a power source to activate LEDs to illuminate the tile opaque surface in different patterns in response to information received by the sensors, as directed by the software program. In some embodiments, the control system tracks responses from the sensors to “score” the game. In some embodiments, scoring the game is based upon a number of correct responses and a second number of incorrect responses by the one or more players.

**[0016]** In some embodiments, the interactive game installation additionally comprises one or more non-tile interactive features mounted on non-floor room structures, such as a wall a ceiling, or a room fixture, for example. The non-tile interactive features comprise a sensor and an LED, in some embodiments. The sensors and the LEDs of the non-tile interactive features are communicatively coupled to the game control system to receive an illumination signal and transmit a sensed signal, similar to the interactive tiles, in some embodiments.

**[0017]** The foregoing and other features and advantages of the invention will be apparent to those of ordinary skill in the art from the following more particular description of the invention and the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0018]** **FIG. 1A** is a top view of an array of tiles of an interactive game system;

**[0019]** **FIG. 1B** is a top view of an alternative embodiment of an array of tiles of an interactive game system;

**[0020]** **FIG. 2** is a perspective view of an individual tile of an interactive game system;

**[0021]** **FIG. 3** is a top view of a tile housing of an interactive game system;

**[0022]** **FIG. 4**A is a first side view of a housing for a tile of an interactive game system;

**[0023]** **FIG. 4B** is a second side view of a housing for a tile of an interactive game system;

**[0024]** **FIG. 5** is a top perspective view a three tile housings coupled by tile connectors;

**[0025]** **FIG. 6A** is a bottom perspective view of a tile connector of an interactive game system;

**[0026]** **FIG. 6B** is a top perspective view of a tile connector of an interactive game system;

**[0027]** **FIG. 6C** is a side view of a tile connector of an interactive game system;

**[0028]** **FIG. 7A** is a bottom perspective detail view of four tile housings coupled to a tile connector of an interactive game system;

**[0029]** **FIG. 7B** is a top perspective detail view of a tile housing coupled to a tile connector of an interactive game system;

**[0030]** **FIG. 8A** is a top perspective view of a light emitting diode (LED) printed circuit board (PCB);

**[0031]** **FIG. 8B** is a bottom perspective view of an LED PCB;

**[0032]** **FIG. 9** is a diagram of a tile controller for an interactive game system;

**[0033]** **FIG. 10** is a diagram of a tile comprising a tile controller having a plurality of sensors;

**[0034]** **FIG. 11** is a diagram of a server central processing unit for an interactive game system; and

**[0035]** **FIG. 12** is a diagram of communication signal pathways between a plurality of tiles and a server central processing unit for an interactive game system; and

**[0036]** **FIG. 13** is a diagram of communication signal pathways between a plurality of tiles forming a tile cluster and a server central processing unit for an interactive game system.

## DETAILED DESCRIPTION

**[0037]** Various example embodiments of an interactive game installation, including methods of use and methods of manufacture, are disclosed herein.

**[0038]** An interactive game installation comprises features, such as a floor tile, a wall button, or other feature, that include an illumination source and a sensor. As discussed herein, in some embodiments the illumination source is a light emitting diode (LED) semiconductor chip on a printed circuit board (PCB) mounted inside the feature. Each feature additional comprises a translucent covering through which light from the LEDs is transmitted. The feature may be a floor tile, a handle, knob, or the like assembled on a

floor or mounted to a wall, ceiling, or other indoor surface at the location of an interactive game room installation.

**[0039]** A plurality of floor tiles may be assembled and physically coupled together by a connector hidden beneath a stepping-surface formed by an array of individual tiles assembled side-to-side. The hidden connector mechanically couples together adjacent tiles, thereby stabilizing the tile array and permitting flexibility in the size and overall shape of the tile array assembly as will be discussed further below. Stability of the tile array is extremely important during game play, which involves stepping, jumping, hopping, etc. between tiles and can generate significant forces depending on the physical size of the players tending to separate the tiles and pull apart the array.

**[0040]** In some embodiments, the feature(s) also comprise a sensor. In the broadest sense, the sensor detects when a player contacts a stepping surface or other contact surface of the feature and communicates this information to the game control system. A player's response to an illuminated feature is detected and tallied by the game controller thus creating a player score. Depending on the feature and the illumination cue, the player response may comprise by stepping on, touching, tapping, or gripping the feature, depending on the specific game played. In some embodiments, the sensor can be "tuned" to respond to motion closely proximate to but not physically contacting the feature surface, such as by the player waving her hand over a button. Consequently, the sensor functionality is also extremely important to allow for a wide variety of game play with accurate scoring.

**[0041]** Sensors for interactive game floors and game room features known in the art employ mechanical pressure switches and solid-state piezoresistive sensors to detect when a player contacts the feature, such as stepping on a floor tile. Detection, however, requires a fixed amount of pressure normal to the sensor, whether to move a pressure switch or sufficiently deform a piezoresistive element.

**[0042]** In contrast, some embodiments of the interactive features of the interactive game installation disclosed herein comprise a capacitive contact sensor. This offers many advantages over the prior art, such as higher sensitivity, tunability (through signal processing software executed by the game control system), increased durability, and

others. In some embodiments, therefore, a minimum signal threshold from a capacitive sensor required for the game controller to register the correct response when a player contacts an interactive feature can be "tuned" across a range of sensitivity values. This tunability allows for adjusting the game for play by small children versus adults, and to adjust for changing environmental conditions such as relative humidity, for example.

Definitions:

**[0043]** Before presenting a detailed discussion of the several drawing figures setting forth additional details, some definitions are listed in an attempt to clarify the meaning of certain terms as used herein below.

**[0044]** "Perimeter," as used herein, means the outline or outer boundary of a two-dimensional geometric shape.

**[0045]** "Contiguous," as used herein, means next to or adjoining. Contiguous structures typically contact one another but may simply adjoin in very close proximity without physically touching.

**[0046]** "Translucent," as used herein, refers to a structure or a surface that allows light, including visible light, to pass through without showing distinct images therethrough. This is distinguished from a transparent structure that shows distinct images or an opaque structure that does not allow visible light to pass through.

**[0047]** "RGB," as used herein, means the RGB additive color model known to those in the image processing arts.

**[0048]**

Discussion of the drawings:

**[0049]** The several drawing figures discussed below are used to set forth additional details about these and other embodiments.

**[0050]** **FIG. 1A** is a top view of an array of tiles of an interactive game system. **FIG. 1B** is a top view of an additional embodiment of an array of tiles of an interactive game system. **FIGs. 1A–B** show non-exclusive example embodiments of a stepping floor 102 of an interactive game system 100. Stepping floor 102 shown in **FIG. 1A** comprises a plurality of tiles 200 formed into an array 101. Array 101 has a shape defined by an outer

perimeter 103 comprising sides of the contiguous tiles 200 forming the outermost rows and outermost columns of array 101, wherein the side is not adjacent to a side of another tile 200. The shape of array 101 may be square, rectangular, comprise a combination of rectangular shapes such as the example embodiment shown in **FIG. 1B**, or have a non-rectangular polygonal shape, without limitation.

**[0051]** Each tile 200 is fitted with a cover 218 having a stepping surface 219. The plurality of stepping surfaces 219 presented by tiles 200 in array 101 collectively form stepping floor 102. Stepping floor 102 approximates the shape and dimensions of array 101. In some embodiments, a coating of non-skid surface material 215 is applied to stepping surface 219 to mitigate slipping of players' footwear during vigorous game play.

**[0052]** **FIG. 2** is a perspective view of an individual tile of an interactive game system. FIG. 2 shows external surfaces and features of tile 200 in an example embodiment. An individual tile 200 within array 101 may be generally square-shaped, as shown in the several drawing figures included herein. This is by way of example and not meant to be limiting. In some embodiments, tile 200 may have a non-square rectangular shape. In some embodiments, tile 200 may have a non-rectangular polygonal shape. In some embodiments, tile 200 may have a curvilinear shape.

**[0053]** Tile 200 comprises a tile housing 201 topped cover 219. Housing 201 and cover 219 define a tile interior 226 discussed in more detail later herein. Housing 201 comprises a plurality of surfaces and at least one connection feature 213. Each connection feature 213 presents a shape to physically interact with a corresponding shape presented by a tile connector 250 such that two tiles 200 may be coupled together at connection features 213 by a tile connector 250. In this manner, a plurality of tiles 200 are coupled together for form array 101 of system 100. Coupling of tiles 200 by connectors 250 is discussed in greater detail below and mitigates the need to use additional constraining means along perimeter 103 of array 101, such as room walls abutting sides of perimeter 103, for example, to prevent movement of tiles 200 forming perimeter 103 and disruption of array 101.

**[0054]** Cover 219 is translucent and configured to transmit light generated from one or a plurality of light sources housed within an interior of tile 200 to be visible to a player of

game system 100. Additionally cover 219 externally presents an outer stepping surface 219 that may be stepped upon by the player during game play. Stepping surface 219 may comprise a non-stick surface material 215, in some embodiments, such as a non-polished or other high-friction surface. Cover 219 may be formed from tempered glass, in some embodiments.

**[0055]** **FIG. 3** is a top view of a tile housing of an interactive game system. **FIG. 3** shows a tile housing 201 of tile 200, in some embodiments. Tile housing 201 comprises one or more sides 206 coupled to a bottom 202. Sides 206 and bottom 202 bound and define a tile interior 226.

**[0056]** Tile interior 226 is configured to house various electronic and other components of tile 200. Examples of such components include a sensor 280, wiring for power, communication cables, and tile PCB 272, in some embodiments. Tile interior 226 is closed by translucent cover 218. In some embodiments, tile housing 201 comprises a recess 209 disposed along a tile side periphery defined by top edges of adjacent sides 206. Recess 209 forms a hollow for receiving cover 218, in some embodiments. Recess 209 is ideally configured with a depth such that cover 218 rests substantially flush with rim 210 such than a plurality of tiles 200 forming an array and covered by a corresponding plurality of covers 209 create a substantially smooth, even, and unbroken stepping floor 102 for game play. In some embodiments, cover 209 is coupled to housing 201 at recess 209 by an adhesive. The adhesive may be an epoxy or similar two-stage composition, a silicone-based adhesive, a bedding compound, or other adhesive known in art suitable for coupling dissimilar compounds such as glass and plastic.

**[0057]** Interior 226 houses various electrical and electronic components, mounting features and hardware, etc. of tile 200. For example, in some embodiments, one or more support pegs 211 are coupled to bottom 202 act to support cover 218. One or more mounting bosses 212 receive mounting hardware for coupling various components, such as a printed circuit board, for example, to bottom 202 or side 206, in some embodiments. Housing 201 may be formed as a unitary body with support peg 211 and/or mounting peg 212 during manufacture. A substantially rigid plastic or similar polymer may be used to form tile housing 201. Some non-exclusive examples of such polymers include

polypropylene, polycarbonate, polyethylene, acrylonitrile butadiene styrene, polymethyl methacrylate (acrylic), polyoxymethylene (polyacetal), and polyamide (nylon). Others will be known to those of skill in the manufacturing arts. Metals or metal alloys may alternatively be used, including aluminum, steel, or others. Manufacture of housing 201 formed as a unitary body is accomplished, for example, by standard injection molding, 3D-printing, stamping, or other suitable techniques known in the art. Alternatively, sides 206, bottom 202, and other components of housing 201 may be assembled by annealing, welding, use of adhesives, or alternative means, without limitation.

**[0058]** In some embodiments, each side 206 forms a recess 209 having a raised rim 210 disposed around an upper aspect of sides 206. Recess 209 receives cover 219 and provides support around the periphery of cover 219. Centrally, cover 219 is supported by one or more pegs 211, as shown in **FIG. 3**. Robust support of cover 218 is essential to provide a stable stepping surface 219 for tile 200 collectively forming stepping floor 102 of game system 100.

**[0059]** **FIG. 4A** is a first side view of a housing for a tile of an interactive game system. **FIG. 4B** is a second side view of a housing for a tile of an interactive game system. **FIGs. 4A–B** show two separate sides 206 of tile 201. Side 206 is formed by a combination of a first surface 240 intersecting with a second surface 241 at angle α, as shown in **FIG. 4A**. In some embodiments, first surface 240 extends generally orthogonally from bottom 202 to intersect non-orthogonally with second surface 241. Second surface 214 of side 206 extends between first surface 240 and a recess 209, angling outward from surface 240 to form an overhang with respect to an outer edge of bottom 202. This configuration allows for a space between adjacent tiles 200 when coupled together in array 101 wherein additional components of interactive game 100 running between tiles–such as electrical wires and communication cables for power and data transfer between tiles, and the like–are positioned between tiles 200 and in a fully hidden, protected location beneath the stepping surface of interactive game installation 100. Also as discussed below, connection means fixing the plurality of tiles 200 within array 101 are also hidden beneath stepping floor 102 and protected from damage by rapid, vigorous stepping during game play.

**[0060]** **FIG. 5** is a top perspective view a three tile housings coupled by tile connectors. **FIG. 5** shows three tile housings 201, each coupled to one or more adjacent housings 201 with a tile connector 250. Tile connector 250 is discussed in detail herein below. **FIG. 5** additionally shows rim 210 of two adjacent, coupled housings 201 maintained in contact or near-contact by connector(s) 250. Only the portion of the central connector 250a not covered by a (fourth) tile housing 201 is visible in this top-perspective view.

**[0061]** As shown in **FIG. 5**, and in some embodiments, bottom 202 of tile housing 201 is fitted with a support peg 211, a mounting boss 212, and a mounting hole 216 disposed within mounting boss 212. A tile printed circuit board ("PCB") bearing one or more light-emitting diodes ("LEDs") is attached to housing 201 at one or more mounting bosses 212 by a corresponding number of fasteners, such as a screw, a clip, or other suitable fastener, in some embodiments. In some embodiments, an alternative attachment means is used to mount the tile PCB to housing 201, such as use of an adhesive or by annealing, for example. In some embodiments, a plurality of support pegs 211 may be evenly distributed across bottom 202 and extending to a height equal to the height of side 206 at the bottom of recess 209 such that pegs 211 solidly support cover 219 fitted to tile housing 201 during game play. In some embodiments, sides 206 are penetrated by a plurality of ventilation slots 208. The slot-like shape of ventilation slot 208 is not meant to be limiting, however, and other shapes, numbers, and configurations of ventilation slots 208 are possible. In some embodiments, at least one side 206 contains one or more wiring holes 217 (as shown in **FIG. 4B)**. Wiring holes 217 permit passage of electrical wiring to power interactive tile 200 and for communication cables to interconnect an array of tiles 200 to the game controller. In some embodiments, wiring hole 217 is disposed through first surface 240. In some embodiments, wiring hole 217 is disposed through second surface 241.

**[0062]** **FIG. 6A** is a bottom perspective view of a tile connector of an interactive game system. **FIG. 6B** is a top perspective view of a tile connector of an interactive game system. **FIG. 6C** is a side view of a tile connector of an interactive game system. **FIGs. 6A–C** show a tile connector 250 having a top surface 251, an under surface 252, a connector side 253, and a complementary feature 254. A plurality of connectors 252 interlock with a plurality of tile housings 201 to form array 101 of system 100. The

interlocking of housings 201 with connectors 252 is roughly analogous to linking of individual pieces together in a jigsaw puzzle, in some embodiments.

**[0063]** Tile connector 250 comprises at least two complementary features 254. Complementary feature 254 of connector 250 mates (interlocks) with a corresponding connection feature 213 of tile housing 201 to physically couple together at least two tile housings 201. In some embodiments, connectors 250 coupling a plurality of tile housings 201 together in array 101 are hidden beneath the side recesses 209 of adjoining tile housings 201. This is possible wherein side 206 comprises an angle of less than about 90° between bottom 202 and recess 209 creating a hidden space between sides 206 of adjoining tile housings 201 whereunder connectors 250 are situated. In some embodiments, an under surface 252 of connectors 250 and bottom 202 of an array 101 are substantially co-planar for installation upon a floor surface of a facility for an interactive stepping game.

**[0064]** In embodiments wherein tiles 200 have a rectangular shape, tile connectors 250 directly and robustly couple together each tile 200 not adjacent to perimeter 103 at least four points, as shown by the several drawing figures. Because tile connectors 250 are not exposed and form no part of stepping floor 102, connections between tiles resist separation by player activity during game play. Moreover, directly coupling tiles 200 together at multiple locations on each tile reduces or obviates the need for additional means to couple and constrain tiles 200 along perimeter 103 of array 101, such as with a perimeter seal, by room walls, or by steps or similar barriers along the perimeter of array 101. The connectors 250 and the tiles 200 all rest on and are supported by the underlying floor at an installation location. Following assembly of array 101, direct player contact with any part of connector 250 is not possible because connector 250 is hidden beneath second surface 241 of side 206 (*see, e.g.*, **FIG.s 4A–B** and **FIG. 5**). Both connector 250 and bottom 202 of tile 200 rest directly on the underlying floor, consequently downward forces exerted on the tiles (and partially transmitted to the connectors) during play is resisted by the essentially immovable plane formed by the underlying floor. Moreover, shear forces imparted on each tile by a non-vertical force component of player stepping is resisted by the large interlocking surface areas of each connector interacting with each tile 200 coupled to the connector. Separation of two adjoining tiles 100 coupled with two

connectors 250 by a non-vertical shear force is only possible by breakage of one or both of the connectors 250. This is distinguished from prior art connectors that are not directly supported by an underlying floor structure, which are exposed on the stepping surface, and are directly subjected to shear forces generated during game play.

**[0065]** A rigid and substantially smooth, stable floor surface sufficient to support array 101 of tiles 200 coupled together by connectors 250, such as a concrete slab, tile flooring, hardwood flooring, or the like, would provide a suitable floor surface in a building structure housing an interactive game installation 100. A subfloor is completely unnecessary, distinguishing system 100 from the prior art.

**[0066]** Connector 250 comprises two or more connector sides 253 extending from a top surface 251 opposite an under surface 252. Complementary feature 254 is disposed between two connector sides 253 and is configured to mate with a correspondingly shaped connection feature 213 of tile housing 201. In the example embodiments shown by the several drawing figures, complementary feature 254 has the shape of a socket-portion (female) of a dovetail joint and connection feature 213 has the shape of the tail portion (male) of a dovetail joint, such that feature 254 and feature 213 mate (interlock) to form a dovetail joint. In some embodiments, other corresponding feature elements shaped to mate together may alternatively or additionally be employed between tile connector 250 and tile housing 201.

**[0067]** In some embodiments, tile connector 250 is a unitary body. Connector 250 may be formed from a substantially rigid plastic or similar polymer, such as polypropylene, polycarbonate, polyethylene, acrylonitrile butadiene styrene, polymethyl methacrylate (acrylic), polyoxymethylene (polyacetal), and polyamide (nylon), for example. Others will be known to those of skill in the manufacturing arts. Metals or metal alloys may alternatively be used, including aluminum, steel, or others. In may be desirable, in some embodiments, to form connector 250 from a metal or metal alloy because of increased strength and resistance to breakage versus use of a rigid plastic polymer. Manufacture of connector 250 formed as a unitary body may be accomplished, for example, by standard injection molding, 3D-printing, stamping, or other suitable techniques known in the art depending on the type of material used.

**[0068]** **FIG. 7A** is a bottom perspective detail view of four tile housings coupled to a tile connector of an interactive game system. **FIG. 7B** is a top perspective detail view of a tile housing coupled to a tile connector of an interactive game system. **FIGs. 7A–B** show an example configuration wherein a plurality of tile housings 201 may be coupled together by tile connector 250 through an interaction between connection feature 213 and corresponding complementary feature 254. Interlocking of housing connection feature 213 with tile connector complementary feature 254 allows for rapid, secure, and straightforward assembly of array 101.

**[0069]** **FIG. 8A** is a top perspective view of a tile light emitting diode (LED) printed circuit board ("tile PCB"). **FIG. 8B** is a bottom perspective view of an TILE PCB. Tile 200 electronic components are mounted in tile interior 226 and include at least one LED 270, a tile PCB 272, and a sensor 280. **FIGs. 8A–B** show a tile PCB 272 having a plurality of LEDs 271. In some embodiments, PCB 272 comprises four (4) LEDs. In some embodiments, PCB 272 comprises nine (9) LEDs. In some embodiments, PCB 272 comprises sixteen (16) LEDs. In some embodiments, PCB 272 comprises twenty-five (25) LEDs. In some embodiments, PCB 272 comprises thirty-six (36) LEDs, including the example embodiment shown in **FIG. 8A**. Each individual LED 271 is formed from a semiconductor chip mounted on tile PCB 272. Each individual LED 271 of the plurality of LEDs 271 mounted on a single PCB 272 within a single tile 200 are individually addressable and controlled by a tile processor 281 independently of all other LEDs 271 within that tile 200, as will be discussed below. In the example embodiment shown by **FIG. 8A**, subgroups of the 36 individual LEDs 271 can be activated with the same or different wavelengths, deactivated, flash on-and-off, etc. to create a large variety of tile appearances and visual effects. Each LED 271 in a single tile 200 may emit light of the same wavelength or any number of different wavelengths, individual or in any combination, limited only by the number of LEDs 271 within that tile 200.

**[0070]** Tile PCB 272 is configured to reside and be mounted within tile interior 226 of housing 201, shown in **FIG. 3** and **FIG. 5** by mounting hardware coupled to one or more mounting holes 273, as discussed earlier. When LED 272 is activated by a power source, translucent cover 218 fitted atop tile 200 is illuminated from within housing 201. A tile

controller 270 may also be comprised by tile PCB 272 and is discussed at length later in these disclosures.

**[0071]** **FIG. 9** is a diagram of a tile controller for an interactive game system. As shown by diagrammatic depiction in **FIG. 9**, tile controller 270 coordinates and directs signals between the various electronic components of tile 200 and a server central processing unit 260 (shown in **FIG. 10**). Tile controller 270 includes a microprocessor 274, and a sensor 280. In some embodiments, controller 270 may additionally include a wireless communications module 285. Tile controller 270 further comprises code 291 residing on a tile controller memory 290. Code 291 comprises a firmware and a software, in some embodiments.

**[0072]** In a generic interactive stepping floor game, individual tiles are illuminated to indicate which tiles a player should step on and which tiles the player should avoid stepping on. A tile or game processor (1) receives a signal from the game's central processing unit to illuminate the tile; and (2) generates a return signal to the game's central processing unit containing sensing data to indicate when the tile is stepped upon by a player.

**[0073]** In some embodiments of interactive game system 100, RGB output signals activate and deactivate LEDs 271 in response to (1) a CPU signal received from a server central processing unit; and (2) a sensor signal received from an electronic sensor 270. The CPU signal and other elements of a server CPU 261 which controls game plan and is communicatively coupled to all tiles of array 101 in system 100 are discussed later below. Electronic sensor 280 is discussed now, with respect to tile controller 270 of which it is a part.

**[0074]** Sensor 280 may be an electronic sensor mounted on tile PCB 272 or elsewhere within tile interior 226, in some embodiments. In these examples and some other embodiments, sensor 280 is contained within microprocessor 274 of tile controller 270. One example of an electronic sensor 280 is a capacitance sensor. A capacitance sensor has many advantages over standard mechanical pressure sensors used throughout prior art stepping floor games. Any solid-state electronic sensors to not have moving parts and can never wear out from repeated mechanical movements required for operation of a

mechanical switch sensor. Capacitance sensors also have advantages over electronic inductive sensors because the activation threshold (i.e., sensitivity) of a capacitance sensor comprising an oscillator circuit can be adjusted. Additionally, a capacitance sensor does not require pressure or even physical contact with tile stepping surface 219. Consequently in some embodiments of system 100 wherein electronic sensor 380 is a capacitance sensor, sensor 280 detects player proximity or contact with tile cover 218 but does not require actual player contact for activation. The degree of proximity up to and including contact to trigger activation is determined by what type of shoes the player wears or whether the player is barefoot, surface area proximate to the sensor, and the ambient humidity. Ambient temperature and duration of time proximate to the sensor also affect activation sensitivity but far less so than humidity and the conductivity (dielectric constant, meaning a product of a resistance and a capacitance of a material) to be sensed. This sensitivity can be adjusted or "tuned" by software executed by server CPU 261 and communicated to microprocessor 275 of tile controller 270.

**[0075]** The tuning software alters an RC time constant of the capacitance sensor 280 required to trigger a sensor activation signal from sensor 280. In some embodiments, a portion of sensor 280 acting as a capacitive plate 282 is coupled directly to an inner surface of tile cover 218 opposite of stepping surface 219. Sensor 280 and plate 282 are diagrammatically represented in FIG. 9, discussed herein below. Capacitive plate 282 is built on a translucent or transparent substrate that transmits light from the LEDs to illuminate the cover and carries electrodes with relevant electrical connectors under the protective flat surface formed by cover 218. Plate 282 in an actual plate-like structure mounted within tile interior 226 beneath cover 218. In some embodiments, plate 282 is coupled to the underside of cover 218. In some embodiments, plate 282 is a grid or network of coplanar conductive wires mounted to a substrate and positioned within tile interior 226 beneath cover 218. In some embodiments, substrate bearing the grid or network of coplanar conductive wires is coupled to the underside of cover 218. In some embodiments, the grid or network of coplanar conductive wires is mounted directly to the inner surface of tile cover 218 without a substrate but by other means, such as by posts, spot-adhesives, or the like in a pattern that creates desirable field strength gradients for an electrostatic capacitance field. In embodiment wherein electronic sensor 280 is a

capacitance sensor with an oscillating circuit, the oscillating circuit charges and discharges a capacitor in oscillating cycles, as known in the art.

**[0076]** A charge capacitor generates a surrounding electrostatic field. Sensor 280 comprises capacitive plate 282. When a player physically contacts or is proximate to stepping surface 219, the electrostatic field generated by a capacitance electronic sensor 280 is altered by the physical electrical properties of the player's body and clothing entering the electrostatic field, changing the discharge threshold and, consequently, the oscillation rate. Where "baseline" means no player proximity to the electrostatic field, a baseline oscillation charge/discharge frequency of the capacitor is determined by the strength of an output current from the capacitor during discharge. The capacitance variation caused by a player entering the electrostatic field is communicated by sensor 280 to microprocessor 274 which determines whether the player's "touch" is valid depending on whether capacitance variation exceeds a set value. The set value is input to server CPU 261 by a user of system 100 and communicated to tile controller 270 by server CPU 261. In this manner, electronic sensor 280 may be adjusted or "tuned" to accommodate different characteristics of a player (i.e., shoes or barefoot), game type (i.e., requiring physical player contact or "waving across" without touching stepping surface 219), and environmental (i.e., humidity) conditions, and the like, by adjusting the sensitivity value for activation of sensor 280.

**[0077]** In some embodiments, a single tile controller comprises a plurality of sensors 280

**[0078]** Microprocessor 274 executes firmware comprised by code 291 residing on tile controller memory 290 in some embodiments. Microprocessor 274 computes RGB outputs from an RGB signal input received from server CPU 261, reads output from sensor 280, and interfaces with server CPU 261 by a wireless communication means, such as WiFi or Bluetooth, in some embodiments. In some embodiments, code 291, including the tile firmware or the tile software, is or may be updated wirelessly by an external computing device not comprised by and fully external to interactive game system 100. In some embodiments, tile controller 270 comprises an ESP32-S3-WROOM-1 manufacture by Espressif Systems, Incorporated of Shanghai, China. In some embodiments, tile controller 270 comprises three (3) RS485 model THVD1420D

controllers manufactured by Texas Instruments Inc. of Dallas, Texas. These examples are provided to enable certain embodiments of system 100 and are not exclusive nor meant to narrow the scope of these disclosures. Other hardware elements having different technical specifications are possible, as will be appreciated by persons of skill, and are considered within the scope of the disclosures provided herein.

**[0079]** Tile controller 270 additionally comprises, in some embodiments, an RGB controller 275, an input controller 276, and a sensor controller 277, as diagramed in **FIG. 9**. RGB controller 275 receives an input signal from microprocessor 274, server CPU 261, or both microprocessor 274 and server CPU 261, in some embodiments, and directs microprocessor 274 to activate or de-activate any one LED 271 or combination of LEDs 271 of tile 200 according to instructions received directly from server CPU 261 in response to a software instruction from a game play algorithm or from microprocessor 274 in response to an input signal from sensor 280. The input signal received from and/or transmitted by RGB controller 275 may comprise an RGB data, an animation data for changing brightness over time; i.e., to create effects such as pulsating brightness, or a combination of RGB and animation data. Input controller 276 receives a sensor input from sensor 180 of tile 200 and also, in some embodiments, of an adjacent tile 200 and relays the sensor inputs to microprocessor 274. In some embodiments, sensor controller 277 (1) receives and reads a sensor signal from controller 270 of an adjacent tile 200; (2) receives and reads a sensor signal from sensor 280; and sends sensor signals to microprocessor 274.

**[0080]** In some embodiments, tile controller 270 communicates with server CPU 261 over a wired connection. A signal line 278 is shown by FIG. 9 to depict either a wired or wireless connection between controllers 270 and server CPU 261, between two or a plurality of adjacent tiles 200 and each other, and with server CPU 261. Signals between elements are depicted by a signal path 279. Signal path 279 may include electrical power, data, or a combination of power and data. Arrows at the end of lines and arcs shown in signal paths 279 indicate the direction of data flow between elements of tile controller 270, and between controller 270 and external elements such as other controller(s) 270 and with server CPU 261, in this example and in some other embodiments.

**[0081]** **FIG. 10** is a diagram of a tile comprising a tile controller having a plurality of sensors. **FIG. 10** shows an individual tile 200 having a cover 218 with a sensing surface 219 divided into four independently controlled areas of approximately equal area, each independently controlled area labeled with a Roman numeral from I–IV. A sensor 280 comprising a capacitance plate 282 is disposed in the approximate center of each area I–IV proximate to the underside of cover 218. Each sensor 280 is coupled to the single microprocessor 274 of the tile controller 270 (not shown) for the illustrated tile 200 depicted in **FIG. 10**. In this example embodiment, microprocessor 274 independently directs illumination of LEDs 271 on each respective section of tile PCB 272 positioned beneath each corresponding independently controlled area of cover 218 in response to signals received from (1) sensor 280 for the corresponding quadrant; and (2) an input signal received from server CPU 261. Therefore, stepping surface 219 of tile cover 218 can be separated into a plurality of independently controlled areas that are illuminated and sensed separate from other independently controlled areas of the same tile stepping surface 219. In this manner, stepping floor 102 of system 100 is subdivided into multiple, smaller independently controlled areas whereupon options for game play are increased. In this example, and in some other embodiments, changing the number of independently illuminated and sensed areas of stepping floor 102 may be accomplished without changing the number or dimensions of individual tiles forming array 101. Rather, the number of independently controlled areas of stepping floor 102 may be increased or decreased by software executed by server CPU without changing the physical configuration of–or number of tiles comprised by–stepping floor 102. In some embodiments, such as the example embodiment shown in **FIG. 10**, there are four independently controlled areas. In some embodiments, there are two independently controlled areas. In some embodiments, there are three independently controlled areas. In some embodiments, there are greater than four independently controlled areas. In some embodiments, there are no independently controlled areas and there is only one sensor 280 for a single stepping surface 219 of cover 218.

**[0082]** **FIG. 11** is a diagram of a server central processing unit for an interactive game system. **FIG. 11** shows a game control system 260 comprising a server central processing unit ("CPU") 261, a memory 262, and a communication module 285. Game control

system 260 may also include one or more interface devices, including either or both input and output devices, which deliver input signals to and/or output signals from control system 260. Example input devices include a computer mouse, a keyboard, a trackball or similar tracking device, a printer, a touchscreen, and the like. Interface devices include communication means to receive and/or transmit information to users and other computer systems, cloud storage systems, and the like. Memory 262 may include one or a plurality of computer-readable and computer-writable non-volatile and non-transitory storage media upon which an algorithm containing a game play sequence, rules, and computer-executable instructions is executed by CPU 261. CPU 261, in turn, may cause code residing on memory 262 to be read from the non-transitory recording media into a second memory to allow faster access to information by server CPU 261, in some embodiments. In some embodiments, the computer-readable code residing on memory 262 may be loaded, deleted, or upgraded wirelessly.

**[0083]** Server CPU 261 is communicatively coupled to tiles 200 in an array 101. In some embodiments, server CPU 261 is also coupled to one or more non-tile interactive features 295 of system 101. Such non-tile interactive features may include illuminated panels, buttons, handles, or other structures having one or a plurality of LEDs 271 mounted on a PCB 272 and directed by a controller 270 having a sensor 280, without limitation. A non-tile interactive feature 295 may be disposed on a wall, suspended from a ceiling, or otherwise present within an interactive game installation 100 space. Feature 295 may comprise LEDs, controller PCBs, feature controllers, electronic sensors, and communications modules that communicate with game control system 260 through similar means as tiles 200 already disclosed at length herein. In some embodiments, server CPU 261 is coupled to one or more displays such as to show individual player locations, player scores, and/or other player or game-related information.

**[0084]** Server CPU 261 may additionally be coupled to speakers, house lights, and other components within a gaming facility such as an arcade, and escape-room facility, a laser tag facility, for example. In some embodiments, server CPU 261 is coupled to one or more additional game servers, either local or remote, by a wired or wireless connection. For example, server CPU 261 may be communicatively coupled with a database server

exchange member-specific data, such as member name, game scores, dates played, play history, payment information, etc.

**[0085]** **FIG. 12** is a diagram of communication signal pathways between a plurality of tiles and a server central processing unit for an interactive game system. **FIG. 12** shows interactive game system 100 comprising game control system 260 coupled to a plurality of tiles 200. Each tile 200 comprises a tile controller 270 communicatively coupled to an LED 271 and a sensor 280, as depicted by the directional arrows shown inside each tile 200. FIG. 12 shows an array 101 having two (2) columns and three (3) rows of tiles 200. Each tile 200 is numbered according to column–row; i.e., the third row of the second column contains a tile 200 numbered "2–3." A plurality of signal lines 278 show communicative links between two adjacent tiles 200 and game control system 260. In some embodiments of interactive game system 100, including the embodiment shown in **FIG. 12**, a plurality of tiles 200 are "chained" in series, with the series coupled to control system 260 at a single connection. In the example embodiment shown in FIG. 12, two chains, each comprising three (2) tiles 200 are coupled to control system 260. In some embodiments any number of tiles between two (2) tiles and ninety (90) tiles may be chained together, as represented by a column of tiles 200 shown in **FIG. 12**. Each tile 200 in a chain comprises a standalone tile controller 270 that receives signals, including illumination and animation signals, from control system 260 and sends a signal from sensor 280 to control system 260 along signal lines 278, as shown. In some embodiments, signal lines 278 are hard-wired signal lines. In some embodiments, signal lines 278 are wireless signal lines. An individual tile chain can address itself automatically to receive and send positional data comprising the position (i.e., "2–2") of tile 200 in a chain to game control system 260 in order to receive correct instructions for illuminating and animating LEDs 271 for that tile 200 position and for informing control system 260 when sensor 280 at that tile location delivers an activation signal to tile controller 270.

**[0086]** **FIG. 13** is a diagram of communication signal pathways between a plurality of tiles forming a tile cluster and a server central processing unit for an interactive game system. **FIG. 13** shows a tile cluster 288 communicatively coupled to game control system 260 by signal lines 278 through a single tile controller 270. In the example

embodiment shown in **FIG. 13**, and in some other embodiments, tile cluster 288 can contain up to nine(9) pairs of LEDs 271 and sensors 280, as shown. Each pair of LEDs 271 and sensor 280 is disposed in a tile 200. In some embodiments, two, three, four, or five clusters 288 are communicatively coupled to game control system 260. In some embodiments, greater than four (4) clusters 288 are communicatively coupled to control system 260. Each tile controller 270 of cluster 288 address itself automatically to receive to receive and send positional data for each tile 200 in cluster comprising the cluster 288 (i.e., “2–2”) to game control system 260 in order to receive correct instructions for illuminating and animating LEDs 271 and for informing control system 260 when sensor 280 at that tile location delivers an activation signal to tile controller 270.

**[0087]** An interactive game installation has been disclosed herein. The installation components include capacitive sensors disposed within a plurality of interactive floor tiles formed into an array. The capacitive sensors may be tunable by a software algorithm executed by a game control system. Additional interactive features having capacitive sensors may also be present in the installation disposed on walls or other room surfaces. The tunable sensors allow for adjusting the interactive game installation to optimize play for both small children and larger, bulkier adults. Connection features are situated on tile housings which mate with tile connectors bearing a complementing feature to stabilize the tile positions withing stepping floor. An interlocking array of interactive tiles and connection features forms a highly stable floor for vigorous game play. Consequently, room walls are not needed to constrain and stabilize the array of interactive floor tiles. This permits installation of larger tile arrays having a variety of shapes and sizes independent of the dimensions of the room floor and location of the room walls.

**[0088]** The embodiments and examples set forth herein were presented in order to best explain the present invention and its practical application, and to thereby enable those of ordinary skill in the art to make and use the invention. However, those of ordinary skill in the art will recognize that the foregoing description and examples have been presented for the purpose of illustration and example. The description as set forth is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible, in light of the teachings herein above.

## CLAIMS

What is claimed is:

1. A floor tile for a stepping game comprising:

   a cover;

   an interior defined by at least one side and a bottom;

   an illumination source;

   an electronic sensor functionally coupled to the cover; and

   a communication means coupled to the illumination source and to the electronic sensor;

   wherein the electronic sensor transmits a signal through the communication means in response to a player contacting or proximate to the cover.

2. The floor tile of claim 1, wherein the illumination source is a light-emitting diode (LED).
3. The floor tile of claim 1, where in the electronic sensor comprises a capacitance sensor with a sensitivity, and wherein the sensitivity can be tuned by a tile controller or a game system controller.

4. The floor tile of claim 3, further comprising a microprocessor electronically coupled to the electronic sensor, wherein the microprocessor modifies a sensitivity of the electronic sensor by causing a change in an RC time constant.

5. A stepping floor for a game comprising:

   a plurality of floor tiles coupled together by connectors to form an array having a perimeter defined by at least two linear sides joined at an angle of about ninety degrees (90°);

   wherein the array presents an external player surface;

   wherein the perimeter is fixed by the connectors;

   wherein the connectors are not externally visible; and

   wherein no additional constraining means are used to fix the perimeter.

ABSTRACT

A game installation comprising an interactive stepping floor and other interactive features is disclosed. Tiles forming the stepping floor, along with other non-tile interactive features in some embodiments utilize capacitive sensors that are activate when a portion of a player's body contacts or is proximate to the tile or other feature. The capacitive sensors may be tunable by a software algorithm executed by a game control system. Tunable electronic sensors allow for adjustment of the interactive game installation to optimize play for both small children and larger, bulkier adults.

SHEET 1 OF 10




FIG. 1A




FIG. 1B

SHEET 2 OF 10




FIG. 2




FIG. 3

SHEET 3 OF 10



FIG. 4A



FIG. 4B

SHEET 4 OF 10




FIG. 5




FIG. 6A




FIG. 6B




FIG. 6C

SHEET 5 OF 10




FIG. 7A




FIG. 7B

SHEET 6 OF 10




FIG. 8A




FIG. 8B

SHEET 7 OF 10




FIG. 9




FIG. 10

SHEET 8 OF 10




FIG. 11

SHEET 9 OF 10




FIG. 12

SHEET 10 OF 10




FIG. 13

# EXHIBIT B

ALSTON & BIRD

The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404
202-239-3300 | Fax: 202-239-3333

**Scott J. Pivnick** Direct Dial: **+1 202 239 3634** Email: **scott.pivnick@alston.com**

December 11, 2023

***Via UPS and Email***

Pixel Games
Attn: Legal Department
Leipziger Chaussee 23
39120 Magdeburg
Germany
sales@pxl-games.com

Re: Activate Patents

Dear Sir/Madam,

Our firm represents Activate Games Inc. ("Activate") with respect to certain intellectual property matters. Activate is a leading provider of high-tech, full-scale interactive games and facilities, with affiliated locations across Canada and the United States (See https://activate.games). Activate's innovative technology is protected by several patents, including U.S. Patents Nos. 11,534,679, 11,511,171, 11,161,050, and 11,452,944, as well as several published pending patent applications, including U.S. Patent Publication Nos. 2021/0220688 and 2023/0118713. Activate's patents all generally concern interactive amusement systems, methods for practicing the same, and related technology.

It has recently come to our attention that Pixel Games, 39 Projekte, and/or affiliates (collectively, "Pixel") is currently advertising and offering for sale to the public in the United States certain game room products and services. For example, we understand that Pixel has opened or is opening over a dozen facilities which are being marketed as featuring an "interactive gaming floor." (https://pxl-games.com/locations/; https://pxl-games.com/). We also understand that Pixel advertises its products and services at industry trade shows and exhibitions in the United States, including the recent IAAPA Expo 2024 in Orlando, Florida.

Activate is concerned that some of the technology incorporated into Pixel's products and services may infringe Activate's issued and pending United States patents. Notably, Activate's '171 Patent, titled "Interactive Floor and Amusement Systems and Methods Employing Same," recites systems and methods for incorporating floor illumination and pressure-sensing features into

an interactive attraction. Pixel appears to offer similar elements at its facilities and through its website and exhibitions, as depicted below:







We write, therefore, for two reasons. First, we seek more information on the configuration of the aspects of Pixel's products and services discussed above, so that we can properly evaluate if there is any overlap with Activate's intellectual property. Second, we seek assurances that Pixel is aware of, respects, and avoids infringement of, all of Activate's intellectual property, including the patents and patent applications listed above. To that end, please let us know if you are available for a call to discuss these issues as soon as possible.

We look forward to hearing from you by December 22, 2023.

Regards,

Scott J. Pivnick

Scott J. Pivnick

# EXHIBIT C

US011511171B2

(12) **United States Patent**
**Schmidt**

(10) **Patent No.: US 11,511,171 B2**
(45) **Date of Patent: Nov. 29, 2022**

(54) **INTERACTIVE FLOOR AND AMUSEMENT SYSTEMS AND METHODS EMPLOYING SAME**

(71) Applicant: **Activate Games Inc.**, Winnipeg (CA)

(72) Inventor: **Adam Schmidt**, Winnipeg (CA)

(73) Assignee: **Activate Games Inc.**, Winnipeg (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 162 days.

(21) Appl. No.: **17/148,989**

(22) Filed: **Jan. 14, 2021**

(65) **Prior Publication Data**

US 2021/0220714 A1 Jul. 22, 2021

(30) **Foreign Application Priority Data**

Jan. 20, 2020 (CA) ................................ CA 3068840

(51) **Int. Cl.**

| | |
|---|---|
| ***A63B 67/00*** | (2006.01) |
| ***A63B 71/06*** | (2006.01) |
| ***E04F 15/02*** | (2006.01) |
| ***E04H 3/10*** | (2006.01) |
| ***E04B 5/46*** | (2006.01) |

(52) **U.S. Cl.**

CPC .......... ***A63B 67/00*** (2013.01); ***A63B 71/0669*** (2013.01); ***E04B 5/46*** (2013.01); ***E04F 15/02194*** (2013.01); ***E04H 3/10*** (2013.01); *A63B 2071/0694* (2013.01); *A63B 2220/801* (2013.01); *A63B 2225/74* (2020.08)

(58) **Field of Classification Search**

CPC ................ A63B 67/00; A63B 71/0669; A63B 2071/0694; A63B 2220/801; A63B 2225/74; E04B 5/46; E04B 5/14; E04B 5/48; E04F 15/02194; E04F 15/02405; E04F 15/02458; E04H 3/10; A63F 13/214; A63F 13/24; A63F 13/816; A63F 13/90

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2006/0154726 A1* 7/2006 Weston .................. A63F 13/12
463/36

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| AU | 2015406125 A1 * | 4/2017 | ............. | A63B 69/00 |
| CA | 2474132 A1 * | 5/2001 | ............. | E04F 15/04 |
| CN | 108352695 A * | 7/2018 | ........ | E04F 15/02405 |
| RU | 200789 U1 * | 11/2020 | ............ | E04C 2/427 |

* cited by examiner

*Primary Examiner* — Jeffrey S Vanderveen
(74) *Attorney, Agent, or Firm* — Kyle R Satterthwaite; Ryan W Dupuis; Ade & Company Inc.

(57) **ABSTRACT**

An amusement system features an interactive floor with an array of panels laid out in one or more grids to collectively define an interactive floor surface, an illumination system operable to individually illuminate each panel, and a sensing system operable to detect presence of any participant atop any panel. A base frame of the interactive floor is composed of a plurality of base modules seated on a subfloor, and supporting a respective panel for one or more cells of the interactive floor. The base modules are not directly fastened together, and instead are only intercoupled by perimeter seals applied over peripheral regions of the panels of neighbouring modules. Separation of the modules is constrained by surrounding walls of a room fully occupied by the interactive floor. In gameplay, some panels are distinctively illuminated as hazards to be avoided by participants, subject to penalty.

**20 Claims, 8 Drawing Sheets**




EXIT
ENTRANCE
10
12
14
16
18
20
22
24
26
28
30
32

FIG. 1

FIG. 2


12
14
16
18
20
22
24
26
28


14
202
28
32
30
206
28
204
28
200
28
28
16
18
28
28
22
20
208
210
28
26
12

FIG. 3


32
30
28
28
28
28
24
26
28
101
28
28
ENTRANCE
EXIT
20
22

FIG. 4




FIG. 5




FIG. 6


94
94B
94B
94A
94B
94B
92
92
92
62
92
92
64
60
74
64
66
88
74
76
90
88
88
66
74
76

FIG. 7


94B
94
94A
92
62
92
92
92
76
78
80
80
74
90
66
64
88
60

FIG. 8




FIG. 9




FIG. 10




FIG. 11




FIG. 12




FIG. 13




FIG. 14


30
Score Display
Life Displays
32
Target
28
Target
28
Target
28
Target
28
Target
28
Target
28
Target
24
28
Target
Speakers
124
Exit Doorway (Sensor)
22
106
Computer
108
Target
28
Sign-In Displays
Entrance Doorway (Sensor + Electric Lock)
20
110
Battery Backup
Audio Control
112
Floor Control Boards
122
Main Power Breakers
120
Power Supplies
118
102
114
104
Microcontrollers
Component PCBs
116
100

FIG. 15


300
Start
Load initial map
302
Start Timer
304
Illuminate wall targets & floor cells according to loaded map: Green = Safe Red = Hazard Blue = Target
306
Timer up?
308
Yes
No
Game Lost
Blue cell actuated?
310
Deactivate
316
312
Wall target actuated?
Deactivate
318
314
Red cell actuated?
Decrement Life Meter
320
Lives remain?
322
Remaining wall/floor targets?
324
Load next map
332
All participants at safe zone?
326
Alert participants
328
All maps completed?
330
Award points
334
Stop – Game Won

FIG. 16

# INTERACTIVE FLOOR AND AMUSEMENT SYSTEMS AND METHODS EMPLOYING SAME

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims foreign priority benefit under 35 U.S.C. 119(a) of Canadian Patent Application 3,068,840, filed Jan. 20, 2020, the entirety of which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to amusement attractions, and more particularly to amusement attractions in which participants interact with illuminable weight-responsive cells of an interactive floor system as part of an immersive live-action gaming experience.

## BACKGROUND

In recent years, escape rooms have become a popular form of immersive, live-action amusement attraction, providing an alternative to more conventional indoor amusement attractions such as laser tag, and to large scale amusement parks that are cost prohibitive, particularly in smaller markets and/or those where outdoor parks are subject to seasonal constraints in climates of notable temperature variation.

This demonstrates a yearning by the public for a greater variety of immersive amusement attractions and experiences, in response to which Applicant has developed a number of such immersive amusement attractions, which are the subjects of this and other concurrently filed patent applications.

The present application focuses on an immersive amusement attraction employing a novel interactive floor environment and related gameplay methodologies.

## SUMMARY OF THE INVENTION

According to a first aspect of the invention, there is provided an amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;



trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence.

According to a second aspect of the invention, there is provided an illuminable floor system comprising:

a plurality of base modules for placement atop a subfloor, each base module defining at least one cell;

a plurality of panels of equal quantity to a total number of cells possessed by said plurality of base modules for support atop one of the base modules in overlying relation to a respective one of the cells to define a respective area of a floor surface to be collectively defined by the plurality of panels, each panel comprising transparent or translucent material through which light is emittable upwardly from said floor surface, thereby illuminating the respective area of the floor surface;

for each cell, a respective illumination source supported on the base module and positioned to emit said light through the transparent or translucent material of the respective panel to illuminate the respective area of the floor surface; and

a supply of flexible perimeter seals provided in sufficient length and quantity to at least line a full perimeter of at least a subset of the base modules in overlaid relation atop a peripheral region of the respective panel of any perimeter-adjacent cell of each base module of said subset, while leaving exposed a larger unobstructed central region of said perimeter-adjacent cell to enable emission of said light from said unobstructed central region, whereby the perimeter seals create a respective rim of raised relation to the floor surface around the perimeter of each base module.

According to a third aspect of the invention, there is provided an immersive amusement system comprising:

a substantially enclosed room having an interior space and an entrance by which participants are admissible thereto;

an interactive floor system installed in said room, and comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of a floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array; and

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

## BRIEF DESCRIPTION OF THE DRAWINGS

One embodiment of the invention will now be described in conjunction with the accompanying drawings in which:

FIG. **1** is a perspective view of an immersive amusement environment employing an enclosed game room whose floor area is spanned wall-to-wall in both directions by an interactive floor featuring an array of illuminable, weight-responsive cells.

FIG. **2** is an overhead view of the game room of FIG. **1**.

FIG. **3** is another overhead view of the game room of FIG. **1**, schematically illustrating distinct illumination of different cells of the array to form different safe zones, hazards and targets to be interacted with by participants during gameplay.

FIG. **4** is a perspective view of a variant of the immersive amusement environment of FIG. **1**, illustrating optional variation in the size and layout of the enclosed game room.

FIG. **5** is an overhead view of the variant of FIG. **4**.

FIG. **6** is a perspective view of a section of the interactive floor from the game room of FIG. **1** or **4**.

FIG. **7** is a close-up partial perspective view of the floor section of FIG. **7**, with perimeter seals of some cells shown in exploded positions.

FIG. **8** is another close-up partial perspective view of the floor section of FIG. **7**, with additional componentry thereof shown in exploded positions to reveal internal assembly details of the floor section.

FIG. **9** is a perspective view of one of a plurality of identical base modules from which a base frame of the interactive floor is assembled, each module defining four neighbouring cells of the assembled interactive floor.

FIG. **10** is an overhead plan view of the base module of FIG. **9**.

FIG. **11** is a cross-sectional view of the base module of FIG. **10**, as viewed along line A-A thereof.

FIG. **12** is bottom perspective view of a floor panel that sits atop a respective cell of the base module to form a respective partial area of the overall interactive floor surface.

FIG. **13** is a top plan view of the floor panel of FIG. **12**.

FIG. **14** is a side elevational view of the floor panel of FIG. **12**.

FIG. **15** is a schematic illustration of a control system for the immersive amusement environment of FIG. **1** or **4**.

FIG. **16** is a flowchart illustrating a computer implemented process by which the control system of FIG. **15** executes a non-limiting exemplary game play session within the immersive amusement environment of the earlier figures.

## DETAILED DESCRIPTION

Referring to FIG. **1**, an immersive amusement environment is shown in the form of an enclosed game room **10** having an upright perimeter wall structure composed of a front wall **12**, an opposing rear wall **14**, a first side wall **16** and an opposing second side wall **18**. The front wall **12** features both an entrance **20** to the room and a separate exit **22** therefrom, for example near respective ends of the front wall **12**, though the game room may alternatively have a shared entrance/exit opening by which the game room's interior space is both entered and exited. In embodiments with a separate entrance and exit, they need not be located at the same wall.

The perimeter wall structure delimits a floor space of the room, a substantial entirety of which is occupied by an interactive floor system **24** defining an array of rectangular cells **26** that collectively span a substantially full dimension of the room's interior space in each of its two horizontal directions of measure. The cell array thus substantially spans both a width dimension of the room measured perpendicularly between the two opposing side walls **16**, **18**, and a depth dimension of the room measured perpendicularly between the opposing front and rear walls **12**, **14**. Accordingly, upon entry into the room, a participant in the amusement attraction will inherently be forced to stand upon the interactive floor, thus ensuring their mandatory interaction therewith during execution of a gameplay session inside the room.



In addition to the interactive floor **24**, the room **10** also features one or more interactive target devices **28** mounted in elevated relation above the interactive floor, whereby gameplay inside the room may involve both foot-based physical interaction with the interactive floor cells (stepping, jumping, foot-tapping etc.), and hand-based or other upper body physical interaction with the separate target devices **28**. Preferably there are multiple target devices **28** distributed around the room. In the illustrated embodiment, the target devices **28** are wall-mounted target devices, of which each perimeter wall of the room features at least one. Preferably there are multiple target devices **28** on all or some of the walls, optionally in varying quantities that may be proportional to the relative wall size, as demonstrated in the illustrated example where the longer rear wall **14** of the room has three target devices, while the relatively shorter side walls **16**, **18** each have only two target devices **18**. Though the front wall **12** is just as long as the rear wall **14** in the illustrated example of FIGS. **1** to **3**, the effective length of the front wall **12** is shortened by the provision of the entrance **20** and exit **22** in this front wall **12**, which therefore has a reduced quantity of target devices relative to the opposing rear wall **14**, and particularly only one target device in the illustrated example. That being said, the quantity of targets need not necessarily be reduced on walls of shorter true length or effective length. Each target device **28** may be a push-button device, touch-sensitive panel, or any other electronic device capable of receiving a physical input denoting an actuation of said device, preferably via handpress or other upper body interaction by a participant, though contact with a raised foot, knee, hip or other body part may optionally be employed by participants.

As can be seen in FIG. **1**, in addition to the target devices, **28** the interior space of the game room **10** in the illustrated embodiment also includes at least one performance display operable to display performance feedback to the participant (s) during a gameplay session. The performance display(s) may, for example, show one or more of: a score tally of incrementing/decrementing points values during successful completion or failure of assigned tasks during gameplay; a running timer; and/or a status meter whose level is incremented or decremented in response to detected failures, similar to a life-bar or health-meter of a video game. In the illustrated embodiment, instead of maintaining a separate score tally, a countdown timer is alone used to both limit the duration of a gameplay session, and to at least partially govern a scoring scheme under which points are only awarded at the end of the gameplay session if all assigned tasks are completed before expiry of the countdown timer. If the countdown timer expires and any assigned task remains incomplete, the participant(s) is/are deemed to have lost the game, and no points are awarded. If all assigned tasks are completed before expiry of the countdown timer, then the participant(s) is/are deemed to have won the game, and is/are awarded a score value equal to the value of the countdown timer at the point in time when the final task was completed. If the life/health status of the status meter reaches zero before expiry of the countdown timer, the gameplay session is terminated prematurely, with the par-

ticipant(s) being deemed to have lost the game, and therefore being awarded no points regardless of the value of the countdown timer at the premature termination of the gameplay session.

In the illustrated example, the running value of the countdown timer is shown on a score display **30**, for example a wall-mounted flat-screen monitor, and the status meter is shown in a separate status display **32**, for example in the form of a plurality of discrete illuminable indicators each representing a respective life or health point that changes from one status to another (lit or unlit) in response to a detected gameplay failure. For example, a series of heart-shaped indicators may initially occupy a fully lit state representing a full-life or full-health status of maximum lives or hit-points, and then be turned off one-by-one in response to each gameplay failure detected in the game session, until none of the indicators are lit. Alternatively, rather than the discrete indicators being heart-shaped to denote health or livelihood when illuminated, they may be X-shaped or skull-shaped to denote health damage or loss of life, thus all starting in an unlit state and then being illuminated one-by-one in response to gameplay failures until all indicators are illuminated. Either way, once all the indicators have changed state, this denotes a loss of the game by its participants, i.e. a "game over" status. The status display **32** may optionally be incorporated into the score display **30**. Instead of using the timer for one-time score determination at the end of a won game, an accruing score tally may be instead maintained independently of the timer during the gameplay session, in which case the running score tally may be shown on the score display **30**, optionally together with the running countdown timer.

FIG. **6** illustrates a section **24**A of the interactive floor **24** in isolation from the room **10**, from which it can be seen that the floor features a base frame **60** for supporting all other components of the interactive floor **24** atop the underlying room floor, which is also referred to herein as a subfloor to distinguish over the floor surface defined by the interactive floor system installed atop the room floor. Atop the base frame **60** are rested a plurality of floor panels **62** placed in closely neighbouring relation to one another in both of the two horizontal dimensions spanned by the underlying base frame **60** so that the topside of the base frame **60** is spanned by rows of such floor panels **62** in both directions. Each rectangular (preferably square) floor panel **62** occupies a corresponding rectangular (preferably square) area of the underlying base frame **60**, which together cooperatively denote a respective rectangular cell **26** of the interactive floor.

FIG. **9** shows an individual base module **64**, a plurality of which are used to assembled the overall base frame **60** of the interactive floor **24**. In the illustrated example, each base module defines a set of four respective bases for four neighbouring cells **26** of the interactive floor, laid out in a 2×2 rectangular array. An outer perimeter of the base module **64** is composed of four linear perimeter members **66** connected end-to-end at right angles to one another to define the overall rectangular outer perimeter of the base module **64**, and thereby also delimiting a rectangular interior space of the base module **64**. A set of linear divider members **68** each span perpendicularly between two opposing perimeter members at midpoints therealong, and thereby divide the overall interior space of the module into four smaller rectangular spaces **70**, each belonging to a respective one of the module's four cells. In the illustrated example, based on prototypes whose perimeter and divider members are composed of wooden 2×4s, the divider members **68** are doubled up in adjacently abutting pairs, whereby two interior sides of each cell base are each defined by a respective half of a divider member, instead of sharing this half of a same divider member with the adjacent side of a neighbouring cell. That being said, shared dividers members may be employed in other variants of the module, which need not necessary be of wooden lumber construction, and may for example may be of molded plastic construction. The two outer sides of each cell base are each defined by a respective half of one of the outer perimeter members **66** of the module **64**.

The base module **64** thus defines four rectangular cell bases each having a rectangular interior space **70** bound on four sides by structural members **66**, **68** of the base module **64**. On all four sides of this interior space **70**, an inner face of the respective structural member **66**, **68** on the side thereof facing into this interior space **70** is equipped with a respective length of RGB LED strip lighting **72**. This strip lighting thus denotes a respective multi-colour illumination source of the cell that is capable of illuminating this interior space **70** of the cell in three different colours (Red, Green, Blue). The respective floor panel **62** of each cell is made of a transparent, or more preferably translucent, material enabling light transmission therethrough and capable of supporting the weight of human participants of varying age and size without permanent deformation. In one non-limiting example, the floor panels are made of translucent high-density polyethylene (HDPE), though other materials, preferably of polymeric composition, may alternatively be employed. Accordingly, activation of the LED strip lighting **72**, or other multi-colour illumination device, of any cell will transmit light upwardly through the at least translucent material of the floor panel **62**, thus emitting coloured light from the topside the panel **62** to illuminate the respective cell of the interactive floor.

Each cell base features a respective set of spacer pads **74** mounted atop its structural members **66**, **68** at all four corners of the cell for the purpose of supporting the respective panel **62** in slightly elevated relation above the structural members **66**, **68** of the base module **64**. In the illustrated embodiment, each panel **62** is secured to the underlying cell base via cooperation of hook and loop fastener elements **76**, **78** attached to the topsides of the base's spacer pads **74** and to the underside of the cell's floor panel **62** near the four corners thereof. On each of the four sides of each cell, the respective structural member **66**, **68** of the cell base has a conductive contact plate **80** of a participant-sensing circuit mounted thereon at a generally central location between the two spacer pads **74** on that side of the cells base. The contact plate **80** is thinner than the spacer pads **74**, whereby the top surface of the contact plate **80** resides at slightly lesser elevation than the top surfaces the spacer pads **74**, and thus also at lesser elevation than the hook or loop fastener elements **76** mounted on the spacer pads **74**.

FIGS. **12** through **14** show, in isolation, a singular respective floor panel **62** of one of the cells. The underside of the panel **62**, in addition to the hook or loop fastener elements **78** adhesively attached at the corners of the panel, features four conducive contact lugs **82** each secured to the panel in protruding relation from the underside thereof. The contact lugs **82** are situated at peripheral regions of the panel **62**, each near a respective side of the panel's outer perimeter at a central distance along this respective perimeter side, whereby the contact lugs are suitably positioned to align with the four contact plates **80** that reside at midpoints of the four perimeter sides of the cell base. The protruding distance of the contact lugs **82** from the underside of the panel **62** is

less than the vertical spacing that normally resides between the underside of the panel and the contact plates **80** on the cell base when the floor panel **62** is installed atop the cell base, but not subjected to the body weight of a participant, or any other participant-exerted downforce. Only when the floor panel **62** is subjected to such body weight or other downforce are the contact lugs **82** on the floor panel **62** displaced downwardly into touching and electrically conductive contact with the corresponding contact plates **80** on the cell base. Such downward displacement of the contact lugs **82** on the underside of the panel **62** under the exerted body weight or other downforce on the topside of the panel **62** may enabled by (a) a resilient compressibility of the spacer pads **74**; (b) resilient flexibility of the floor panels **62**; or (c) a combination thereof.

As shown in FIGS. **12** to **14**, a set lead wires **84** are connected to the contact lugs **82** from the interior cell space **70** beneath the panel **62**, just as another set of lead wires **86** are likewise connected to the contact plates **80** of the cell base from within the interior cell space **70**, as shown in FIGS. **9** and **10**. Each contact lug **82** and corresponding contact plate **80** form a normally-open switch in a respective branch of a participant-detection circuit that is closed when a participant stands on, steps on or otherwise exerts body weight or other downforce on the respective floor panel **62** of a cell. The illustrated embodiment employs four such normally-open switches, each in a respective parallel branch of the sensing circuit, and each at a respective side of the rectangular cell, to ensure confident detection regardless of where the body weight or other downforce is exerted or concentrated on the panel, but it will be appreciated that the number of switches used may be varied. It will also be appreciated that the particular type of switch or other sensing arrangement employed to detect participant presence atop a given cell may be varied without detriment to other inventive aspects of the disclosed invention. Likewise, the type of light source used to achieve multi-colour illumination of each cell may be varied from the particular use of RGB strip lighting mounted around the perimeter of the interior space **70** of the cell base. For example, one could alternatively employ various designs known in the prior art for the construction of interactive, illuminable dance floors.

The lead wires from the four contact plates **80**, four contact lugs **82**, and LED strip lighting of the cell, are preferably bundled together in a respective singular wiring harness **88** for the given cell, as demonstrated by FIG. **9** where the four-cell module **64** can be seen to have four respective wiring harnesses **88**, one for each individual cell. Each wiring harness **88** is plugged into a respective PCB control board for that particular cell, on which a micro controller operates to control the illumination status of LED strip lighting **72** between off, red, green and blue states; and to detect the closure of any of the normally open switches on the sensing circuit to thereby confirm the presence of participant body weight or exerted downforce on the cell's floor panel **62**. The structural members **66**, **68** of each module **64** have small riser feet **90** attached to the undersides thereof at the four corners of the module **64** to elevate the structural members off of the underlying room floor in the installed state of the interactive floor, whereby resulting gaps between the structural members and underlying room floor to enable routing of necessary wiring from the cells to other control hardware (described further below) via gap spaces between the room floor and the structural members of the base modules.

In the illustrated embodiment, each contact lug **82** is a metallic nut secured against the underside of the floor panel



**62** by a respective screw **92** that penetrates vertically through the panel **62** from the topside thereof. Referring to FIGS. **7** and **8**, each panel thus has four such screws **92** residing centrally of the four peripheral regions of the panel **62**. In the fully installed state of the interactive floor **24**, the screws **92** are concealed from sight by perimeter seals **94** that are adhered to the upper faces of the floor panels **62** at the peripheral regions thereof on all four sides of all cells, thereby forming a slightly raised perimeter rim or lip around each cell. With the exception of wall-adjacent perimeter seals installed on outer cells of the interactive floor that neighbour the perimeter walls **12**, **14**, **16**, **18** of the room **10**, each perimeter seal **94** overlaps the floor panels **62** of two neighbouring cells, and is sufficiently wide to cover the peripheral regions of both floor panels of these two cells at the adjacent sides thereof.

A perimeter seal installed at adjacent interior sides of two neighbouring cells of the same module **64** is referred to herein as an inter-cell perimeter seal, while a perimeter seal installed at adjacent exterior sides of two neighbouring cells of two neighbouring base modules **64** is referred to herein an inter-module perimeter seal. Parallel in-line perimeter seals of adjacent cells in one row direction of the array may be seamlessly integral sections of a singular unitary strip **94**A of sealing material, with the parallel inline seals of the other direction being separate individual seals **94**B cut to shorter length to fit between the longer integral seals that run in the other direction of the array. Alternatively, long integral seals may be used in both directions by overlapping the seals at the corners of the cells, though this may be less preferably due to the resulting increased profile height at the points of overlap at the corners of the cells.

In addition to covering the screws **92**, which are preferably counterbored into upper face of the floor panel so as not to create a raised bump in the perimeter seals **94**, the inclusion of perimeter seals **94** creating a slightly raised lip or rim around the individual cells of the interactive floor present other beneficial advantages. Firstly, these rims improve the foot grip for participants walking or running around the room during gameplay, thus denoting notable departure from interactive "dancefloors" of the prior art in which a uniformly planar and continuous floor surface is desired across the entire dancefloor so as not to interfere with sliding foot movement during performance of dance moves. While floor panels **62** with textured upper faces could be used to additionally or alternative improve participant traction on the interactive floor **24**, textured surfaces are more likely to collect dust and grime on the panels themselves **62**, introducing cleaning challenges and reduced light-transmission performance of the illuminable panels **62** when dirtied. Accordingly, the use of smooth, untextured floor panels **62** of purely planar configuration at the upper faces thereof together with the inclusion of a raised perimeter rim or lip around each cell provides balance between provision of adequate foot grip and the cleanliness and optical performance of the panels.

Another benefit is particularly attributable to the inter-module perimeter seals in preferred embodiments where the base modules **64** are not bolted or otherwise fastened to one another, nor fastened down to the underlying room floor. Instead, the base modules **64** are simply laid out side-by-side on the room floor with the adjacent perimeter sides of the base modules **64** in closely adjacent, and preferably abutting, relationship to one another, and the only inter-coupling of the modules **62** to one another is an indirectly coupling thereof by adhered application of the perimeter seals **94** to the floor panels **62** of the modules. The perimeter seals **94**

are made of a flexible material, and thus can be used to accommodate slight variation or non-uniformity in the levelness of the underlying room floor on which the base modules **64** are placed. The flexibility of the adhered perimeter seals can thus cover any subtle gaps between the base modules and their floor panels, and act to smooth the transition between the floor panels **62** of two adjacent modules that might have a slight angular offset between them (i.e. deviating from 100% coplanar relationship with one another) due to variation in the room floor beneath the base modules **64**.

The room **10** is constructed to be of a shape and size making the floor space approximately equal to an integer multiple of the rectangular area possessed by each of the identical base modules **64**, with only a slight extra allowance in each of the room's two dimensions to ensure sufficient clearance during placement of the modules atop the floor space in that that integer quantity. The extra allowance is preferably less than the individual cell width of the modules. As a result, a substantial entirety of the floor space is therefore occupied by the base modules of the installed interactive floor **24**, whereby even though the cells of the different modules are coupled together only by the adhered application of the perimeter seals **94**, separation of the modules from one another is prevented or limited in each horizontal direction of the room by the constraint imposed on the floor-placed modules by the perimeter walls of the room that oppose one another in that direction. This full occupation of the room by the interactive floor **24** imposes mandatory participation in the gameplay by any room occupants, allows quick and easily installation of the interactive floor without bolted or otherwise fastened interconnection of the base modules, and prevents significant separation gaps from opening up between the modules in the event of slight module shifting, due to the constraints imposed by the wall geometry of the room.

Meanwhile, the inter-module perimeter seals cover up any small gaps that may exist between modules due to slight elevational variations in the room floor. Any slight gaps remaining between the placed modules and the room's perimeter walls may be fully partially filled with shims, spacers, or filler material. Like any non-perimeter base modules that don't directly neighbour the perimeter walls of the room, the wall-adjacent modules may also have perimeter seals applied to all perimeter sides thereof, where at the wall-adjacent sides of these modules, the perimeter seal may be adhered to the adjacent room wall, thus covering any gap and shim, spacer or filler between the module and the room wall.

It will be appreciated that the room **10** need not be limited specifically to a purely rectangular shape like that shown in FIGS. **1** to **3**. This is demonstrated in FIGS. **4** and **5**, where an L-shaped room **10'** has two rectangular wings each fully occupied by a respective rectangular grid of cells assembled from the same modules **64** and panels **62** described above. The cell illumination devices and sensing circuits of both grids are individually addressable by the controller in the same manner as for a singular rectangular grid, whereby the two grids collectively form a larger overall room-filling array of interactive floor cells. It will also be appreciated that while the illustrated embodiment employs multi-cell base modules **64**, embodiments with single-cell base modules could likewise benefit from the use of perimeter seals therewith in the above described manner. Where multi-cell base modules are employed, they also need not be limited to



a square 2×2 cell configuration, and may be provided in other cell quantities and non-square rectangular configurations.

FIG. **15** schematically illustrates a room control system **100** of the game room **10**. The room control system **100** features a collection of control hardware **102**, preferably stored in a utility closet **104** situated outside the interior gaming space **106** of the room **10** occupied by the installed interactive floor **24**. In the illustrated embodiment, the control hardware **102** includes one or more local computers **108**, a battery backup **110**, audio control components **112** including at least an audio amplifier, microcontrollers **114**, component PCBs **116**, and power supplies **118** through which the other control hardware components are powered via main power breakers **120** situated further upstream in the facility's electrical system. Based on input commands from the local computer **108** during execution of game-control software installed thereon, the micro-controllers **104** drive the component PCBs of gameplay elements installed within the internal space of the room for interaction therewith by participants during gameplay, which in this case includes the control boards **122** of the interactive floor cells. Accordingly, the control hardware **102** collectively forms a controller that governs automated execution of a gameplay session within the internal space of the game room. The audio control components **112** are connected to one or more loudspeakers **124** likewise installed in the internal space of the game room **10** for playback of game-related audio to the participants during such gameplay, for example verbal commands guiding the participants as to assigned tasks they are to perform during the gameplay session.

The room control system **100** may be one of a plurality of room control systems that are installed among a plurality of respective game rooms in a shared facility, and are networked together over a local area network as part of a larger overall computerized facility management system. Such facility management system may include a facility management server that hosts, or is communicable with, a local participant database for storing participant profiles and associated scoring records of the participants. There may also a central participant database that is hosted remotely of the facility, for example in a cloud server environment, and is communicable with the facility management server via the internet or another wide area network so that participant profiles from the local participant database can be used to populate the central participant database. The facility management servers of additional facilities can thus access and populate the central participant database, whereby a participant can attend multiple facilities and the scoring results from games played at multiple facilities can be compiled together. Further details on the facility management system, and functions of the room control system **100** other than the interactive floor gameplay processes described herein, are disclosed in Applicant's prior U.S. Provisional patent Application No. 62/846,912, filed May 13, 2019, the entirety of which is incorporated herein by reference.

In the illustrated embodiment of the present invention, the game elements operated by the controller **102** include the interactive floor cells **26**; the target devices **28**; and the score/timer display **30** and status display **32**. The controller **102** is configured to enable selective illumination of any one or more of the floor cells **26** in any one of the strip LEDs three colours (Red, Green, Blue) by sending an appropriate illumination command signal to the control board of that cell. Likewise, the controller is configured to monitor for a positive participant-detection output signal from the control board of any of the floor cells in order to recognize when a

participant is present at a given floor cell, as confirmed by the control board's detected closure of one or more of the normally-open switches of that cell's sensing circuit.

Having described the general componentry and layout of the immersive amusement environment **10**, attention is now turned to particularly novel methods of use. FIG. **3** illustrates a snapshot of the room at some point during a gameplay session making use of both the interactive floor **24** and the wall-mounted targets **28**. During gameplay, illumination of the floor panels **62** in three different colours represents three different cell status categories used during gameplay, and thus visually distinguishable to the participants. In a preferred implementation, green panels denote "safe" panels on which participants can stand without penalty, blue panels denote "target" panels that the participants are tasked to physically interact with by exertion of foot-applied downforce thereon (by standing, stepping, jumping or foot-tapping the panel), and red panels denote "hazard panels" that the participants are specifically to avoid stepping on as they traverse the interactive floor to fulfill the assigned tasks of the gameplay session. Since the black and white line drawings do not convey colour content, the different categories of panels are instead represented using different distinguishable symbols. Panels marked with a circle are safe panels, panels marked with a checkmark are target panels, and panels marked with an "X" are hazard panels. Any panels left unmarked are unilluminated "inactive" panels, thus falling into none of the forgoing three gameplay status categories.

In the illustrated scenario, at least one row of safe panels **200** spanning the length of the side wall **18** near the room entrance **20** are illuminated in green, thus denoting a safe starting zone at which newly admitted participants to the room can stand to start the game. Another one or more rows of safe panels **202** spanning the length of the opposing side wall **16** near the room exit **22** are likewise illuminated in green, denoting a safe destination zone for participants to arrive at upon having fully traversed the width of the room from the starting zone.

A first moving hazard zone **204** situated near the safe starting zone **200** comprises a group of four hazard panels that changes over time in a sequential fashion moving across the depth dimension of the room between the opposing front and rear walls **12**, **14** thereof. The figure illustrates time-base variability in the particular member panels of any moving hazard zone by using an unfilled broken line X to show a previously illuminated panel that has since reverted back to a fully darkened (unilluminated) state from a previously illuminated state, a partially filled X to denote a previously illuminated panel whose light source has been more recently deenergized and is thus fading back to its default darkened state, and a fully filled X to denote a currently illuminated panel whose light source is in its energized state in the hazard colour (red). The first moving hazard zone in the illustrated example is a group of four panels in a same singular width-wise row of the interactive floor **24**, and the room snapshot shows the variable group of panels migrating sequentially toward the front of the room on a row-by-row basis.

To achieve this, the controller **102** commands energization of the illumination devices of four cells in the same width-wise row of the cell array in the hazard colour (red) for a brief momentary period, then deenergizes these four cells and energizes a matching next set of four cells in the next width-wise row of the cell array in the hazard colour for another momentary period, and repeats this process serially row-by-row until the latest set of energized hazard panels are in the row nearest the front wall **12** of the room. This sequential activation and deactivation of hazard panels may then be repeated identically, starting from adjacent the rear wall **14** and moving toward the front wall **12** to create a repeating singular-direction sweep of the moving hazard zone **204** across the room depth, or instead repeated in the reverse order back toward the rear wall **14** to create an alternating bi-directional sweep of the moving hazard zone **204** back and forth across the room depth. The energization period for each illumination step may be equal to provide constant-velocity migration of the moving hazard across the room, or the energization period may be varied between different sequential steps to alter the movement velocity and create a greater challenge by reducing predictability of the hazard movement to the participant's trying to avoid contact therewith as they traverse the interactive floor.



A second moving hazard zone **206** situated nearer to the safe destination zone **202** comprises a group of three hazard panels that also changes over time in a sequential fashion moving across the depth dimension of the room, but has its three simultaneously illuminated panels in a same singular depth-wise row of the interactive floor **24**. By comparison with the first moving hazard, this demonstrates that a shared-row set of hazard panels may move in parallel relation along the row they occupy (like the second moving hazard zone **206**), or may move in perpendicular relation to the row they occupy (like the first moving hazard zone **208**). In the case of the second moving hazard zone **206**, instead of energizing and deenergizing the illumination devices of all three cells at the same time, the individual cell at the trailing end of the set in the movement direction is deenergized as a next individual cell in the direction of movement is energized at a leading end of the set, so that the variable group moves incrementally in single-step fashion across the room depth. Once again, the process may be repeated identically to perform a repeating singular-direction sweep of the moving hazard across the room, or repeated in the reverse order to perform an alternating bi-directional sweep of the moving hazard zone back and forth across the room.

Moving hazards need not be limited movement in the depth direction of the room, nor in a direction perpendicular to the participant-tasked travel direction between starting and destination zones. This is demonstrated in the illustrated example by inclusion of a third moving hazard zone **208** which is shown near the front wall **12** of the room, and comprises a group of two hazard panels that also changes over time in a sequential fashion, but moves across the width dimension of the room to be traversed by participants between the designating start and destination zones **200**, **202**. Like the first moving hazard **204**, the panels of this third moving hazard **208** are laid out in a shared row lying perpendicular to the hazard's direction of movement, thought this need not be the case, as demonstrated by the second moving hazard **206**. It will also be appreciated that additional or alternative moving hazards may be composed of a singular changing hazard panel, as opposed to a changing group of multiple hazard panels, and that the direction of movement need not be parallel to a width-wise or depth-wise row of the cell array, and may for example be executed on a diagonal path of the cell array. Also, where a moving hazard is a multi-panel group hazard like those of the illustrated example, the hazard need not be limited to hazard panels in a singular row perpendicular to the direction of movement (like the first or third hazard), or panels in a singular row parallel to the direction of movement (like the second hazard). That is, a hazard may be multiple rows deep

in its direction of movement and multiple rows wide across its direction of movement to create a greater challenge to the participants.

In the illustrated example, two clustered groups of target panels **210**, **212** are illuminated, of which first group of target panels **210** resides between the first and second moving hazard zones **204**, **206** in the width direction of the room between the starting zone **200** and the destination zone **202**, while the second group of target panels **212** resides between the second moving hazard zone **206** and the destination zone **202** in this same width-wise travel direction of the participants. Participants thus must travel from the starting zone **200** to the first group of target panels **210** without stepping on the changing panels of the first or third moving hazard zones **204**, **208**, step on all panels of the first target group **210**, and also reach and step on all panels of the second target group **212**, without stepping on the changing panels of the second or third moving hazard zones **206**, **208**. While the illustrated example features moving hazards, it will be appreciated that non-moving hazards may additionally or alternatively be included in any gameplay scenario, and may include one or more static hazards maintained in a continually illuminated state in the hazard color, and/or one or more blinking hazards whose illumination sources are being repeatedly energized and deenergized to denote switching between hazard status and inactive status, or alternated between illuminated states of different colour (red and blue) to denote switching of the panel between a hazard status and target status.

The wall-mounted targets **28** (wall targets, for short) add an optional extra layer of gameplay interaction to the assigned gameplay task, where the controller **102** also assigns an active status to one or more wall targets **28** that also must be actuated by the participants to successfully complete the task. Preferably, the active status is visually identified to the participants by the controller's energization of an illumination device incorporated into, or aimed at, said wall target **28** so that the active status of that target is visually distinguishable from any inactive target that is either unilluminated, or illuminated in a distinctly different colour from any active wall targets. In FIG. **3**, one target on the rear wall **14** is shown as an illuminated active wall target, as is one target on the side wall **18** at the destination zone **202**.

During gameplay, the controller **102** continually monitors for participant detection signals from any cell **26** currently assigned a hazard or target status, and from any active wall target **28**. In response to detected participant presence on a hazard panel, the controller **102** decrements the current value of the status meter **32** by one life or health point. In response to detected participant presence on a target panel, the controller **102** changes the status of that cell from its previously assigned "target" status to an "inactive" status, and deenergizes that cell's illumination source accordingly so that a participant knows that their actuation of that cell's target panel has been properly recognized when the cell goes dark, denoting that it's no longer an active target. Likewise, detected actuation of a wall target **28** causes the controller **102** to switch that wall target's status to inactive, and to deenergize that target's illumination source (or switch the colour thereof) in order to visually inform the participants of its now inactive status.

FIG. **16** shows one example of a computer-implemented process **300** performed by the controller **102** to carry out a gameplay session in the illustrated game room **10**, where the primary or exclusive gameplay task assigned to the participants is to step on all target panels of the interactive floor **24** and hand-press or otherwise actuate all active wall targets **28**, without stepping on any hazard panels. A gameplay session may involve multiple rounds of play, up to certain predetermined number whose successful completion by the participants denotes winning of the game. From round to round, the particular pattern of hazard and target panels mapped on the interactive floor by the controller **102** is varied based on automated selection from among pre-programmed mapping routines encoded within the game execution software, whose executable statements and instructions are stored in non-transitory computer readable memory of the one or more local computers **108** for execution by one or more processors thereof. With each iteration from one round to the next, the particular mapping routine executed by the controller **102** may vary in any one or more of: the quantity and position of target panels in the interactive floor; the inclusion, omission, quantity and particular selection of wall-mounted targets to accompany the floor-based target panels; the quantity size, shape, position and/or non-moving vs. moving status of the hazard panels; the direction and/or velocity of movement of moving hazards; and/or the constant vs. blinking status of non-moving hazards. Optionally, the complexity of challenge presented may be increased with passing rounds, whether with each individual round, or periodically after a certain number of rounds of relatively similar complexity.



At the first step **302** of the process **300**, the game session is initialized by having the controller **102** load an initial mapping routine from among a selected batch of the preprogrammed routines encoded within the game execution software. Via an electronic sign-in station of the room that is connected to the local computer(s) **108**, as shown in FIG. **15**, the participants may be able select different game options for the given game session prior to initialization thereof, for example to select from among different difficulty levels of escalating value (Level 1, Level 2, Level 3, etc.). To better ensure gameplay does not become predictable to repeat participants, the batch of routines for a game session may be selected randomly from among a larger pool of level-specific routines, optionally with further randomization of the order in which the batched routines are loaded and executed in the gameplay session. The sign-in station preferably resides near the entrance of the room, and preferably outside the room to enable sign-in by waiting participants while current participants are involved in a gameplay session inside, and may be used to govern the admission of participants, for example in the manner described in applicant's aforementioned U.S. provisional patent application incorporated herein.

In preferred embodiments where a gameplay session is a timed session having a predetermined time limit, then at step **304** the controller **102** starts running the timer to countdown the predetermined time limit, and shows the running countdown timer on the score display **30** of the room throughout the duration of the gaming session. Together or concurrently with starting of the timer, the controller **102** illuminates the safe, target and hazard panels in their different colours at step **306** according to the loaded mapping routine, and likewise illuminates any active wall targets likewise dictated by the loaded mapping routine. Instead of being illuminated during initialization of the session, the safe panels may optionally be pre-illuminated in an initial pattern before start of the gameplay session to denote where the participants can safely stand as the first floor map is loaded and initialized.

With the target and hazard panels now illuminated, along with active wall targets if included in the room and assigned by the loaded mapping routine, and with the hazard panels

being varied over time if the currently selected mapping routine includes moving hazards, the controller **102** continually monitors for: expiration of the timer, participant actuation of any blue target panel, participant actuation of any active wall target, and participant actuation of any red hazard panel, as shown respectively at steps **308**, **310**, **312**, **314**. The illumination of the floor panels and wall targets at step **306** may also be accompanied by automated playback of verbal instructions over the loudspeaker **124** to inform the participants that their task is to reach and actuate the target panels and wall targets without touching any of the hazard panels, and optionally to traverse the room to the safe destination zone **202** if this an assigned task of the current round based on the loaded mapping routine. In some embodiments, or in particular rounds or levels, traversal of the interactive floor surface to a particular destination zone may be excluded from the participants' assigned task. In place of such tasked destination, completion of the round may simply require that the participants proceed to any green safe zone, the size and positions of which may vary from the illustrated example that has two isolated safe zones at opposing ends of the room. For example, in one variant, a designated safe zone may span around the full perimeter of the room, and delimit within this full-perimeter safe zone an active playing space within which all hazards and target panels are constrained to allow participants the ability to always step or hop into a nearby safe zone to avoid a given hazard.

If expiration of the timer is detected at step **308**, then this denotes loss of the game by the participant(s), and the controller **102** terminates the game session. Otherwise, the game session continues. If actuation of a blue target panel is detected at step **310**, then at step **316**, the controller **102** changes the mapped status of this panel from a target panel to an inactive panel, and deenergizes the illumination source of the cell accordingly. Likewise, if actuation of an active wall target is detected at step **312**, then at step **318**, the controller **102** changes the mapped status of this wall target **28** from active to inactive, and deenergize the associated illumination source of the wall target accordingly. If actuation of a red hazard panel is detected at step **314**, then at step **320**, the controller **102** decrements the current value of the status meter **32** by one life or health point. In response to this detected actuation of a red hazard panel, the controller checks at step **322** whether the value of the status meter is now zero, denoting loss of all lives or health points, in which case the controller **102** terminates the game session, denoting loss of the game by the participant(s). Otherwise, the game session continues.

At step **324**, the controller checks whether all target panels and active wall targets have been actuated. So long as the controller **102** identifies at least one remaining active target panel or wall target **28** at step **324**, the ongoing monitoring for timer expiration, floor and wall target actuation, and hazard panel actuation continues through repetition of steps **308** to **314**. Once successful actuation of all floor and wall targets is confirmed at step **324**, this can optionally be used to signify successful completion of the current round. However, in the illustrated embodiment, successful round completion is also conditional on arrival of all participants at an appropriate safe zone. Accordingly, with the countdown timer still running, the controller **102** checks at step **326** whether all participants are suitably positioned in one or more safe zones. In instances where the assigned task of the round includes travel to a designated destination zone **202**, step **326** sees the controller **102** query all cells other than those of the designated destination zone **202** for the presence of participants, in which case this query includes the cells of the current round's designated start zone **200**. If no participant detection signal is received from any queried cell, then the controller has positively determined that all participants must be located at the designated destination zone **202**. This destination zone can then be treated as the starting zone of the next round, optionally with the starting zone of the just-completed round then being treated as the destination zone of the next round, though a different destination zone may alternatively be assigned, for example dictated by the mapping routine loaded for that next round. If a full-perimeter safe zone, or one or more generic safe zones, are used in instances where there are no designated start and destination zones, then all cells other than the safe zone(s) are queried at step **326**.



If the controller finds at step **326** that not all participants are within an appropriate safe zone, then at step **328**, the participants are alerted of this need to travel to an appropriate safe zone, for example by automated playback of verbal instruction over the loudspeaker **124**. In the illustrated example, the process returns back to step **308** from step **328**, meaning that the timer keeps running while waiting for the participants to reach an appropriate safe zone, and only once all participants are so located will the current round be concluded at step **326**. In the illustrated embodiment, where scoring is purely timer based, this successful round completion does not trigger any accrual of scoring points to a running score tally. However, in other implementations employing such a tally, successful completion of the round may be correlated to awardal of a predetermined quantity of scoring points, the value of which being dictated by the game control software, in which case, upon positive round completion at step **326**, such scoring points would be accrued to the running score tally maintained by the software during the gameplay session, and optionally updated in real-time on the score display **30**.

In the illustrated embodiment, instead of accruing points, the controller checks at step **330** whether the entire batch of mapping routines for the current gameplay session have been completed. If there is at least one unexecuted mapping routine remaining among the current batch, then the controller **102** prepares for the next round by loading the next mapping routine of the current batch at step **322**, which will govern the floor and wall target illumination pattern during that next round. The process then returns back to step **306** to initiate the next round with the newly loaded mapping routine, and repeats the subsequent steps **308** to **330** over again, either until the gameplay session is terminated by expiration of the timer at step **308** or reduction of the status meter level to zero at step **322**, or until step **330** reveals that all of the batched mapping routines of the current session have been completed, thereby denoting that the participants have won the game. In the event of such a win, then final step **334** sees the controller award points to the scoring record(s) of the participant(s), at least partly based on the remaining value of the countdown timer.

In embodiments, with different user-selectable difficulty levels, instead of solely awarding a timer-based score, the awarded points at step **334** may be the sum of the remaining value of the countdown timer, plus a level-dependent bonus value that is proportional to the user-selected difficulty level. The bonus value may be the multiplication product of a fixed bonus factor and a numerical level identifier. In one example, where each difficulty level is identified by a respective integer value (Level 1, Level 2, Level 3), and the fixed bonus factor is 1000, the bonus value is therefore 1000 for Level 1, 2000 for Level 2, 3000 for Level 3, etc. By

supplementing the timer-based score component with a bonus value proportional to the difficulty level, participants are more likely, or guaranteed, to achieve a greater overall score for completion of a harder level than an easier level, even if the harder level took longer to complete. So using this example, if the countdown timer counts in seconds, with each remaining second being worth one point at the end of the session, a participant who wins a Level 2 gameplay session with only 10-seconds left will earn 2010 points, while a participant who wins a Level 1 gameplay session with 60-seconds left will only earn 1060 points.

It will be appreciated that the countdown timer need not necessarily be measured in seconds. Also, the ratio between the timer value and timer-awarded point value may be varied from the forgoing **1**:**1** example, for example to adjust the relative weight ascribed to the difficulty level vs. the speed of completion. Ascribing a greater point value per second would afford greater weight to the speed of completion, whereby a participant completing a gameplay session at an excessively fast speed at a lower difficulty level would be able to achieve a more closely comparable score to another participant's slower completion of a harder difficulty level.

While the illustrated embodiment contemplates three software-controlled categories of floor panels (safe, targeted and hazard), it will be appreciated an alternative implementation may optionally omit the inclusion of the "safe" and/or "target" category and associated steps of the described methodology, without sacrificing the novelty and inventiveness of a system and method employing the computer-controlled and visually recognizable colour coding of hazard floor panels in a variety of different floor mapping routines. Likewise, the accompanying inclusion of wall-mounted or other more-elevated targets separate from the interactive floor may optionally be omitted without detriment to the patentability of the interactive floor construction and novel methods of interactive floor use, though the inclusion of such more-elevated targets is beneficial to introduce greater variety and challenge, where participants must remain visually aware of both ground-level hazards and targets for foot-based actuation, and additional elevated targets requiring hand-based or other upper body actuation.

It will also be appreciated that the particular gaming session described with relation to FIG. **15** is presented purely as a non-limiting example, and that the novel and inventive use of an interactive floor system to create a combination of tasked targets and penalized hazards, and the novel details of the unique floor assembly and cooper able room configuration, may be employed in variety of different interactive game implementations, whether alone or in combination with other game or amusement componentry.

Since various modifications can be made in my invention as herein above described, and many apparently widely different embodiments of same made, it is intended that all matter contained in the accompanying specification shall be interpreted as illustrative only and not in a limiting sense.

The invention claimed is:

**1**. An amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein:

the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;

trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence;

the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants of one or more targets, of which the participants are tasked with actuation to successfully complete said gameplay sequence; and

said one or more targets comprise one or more target devices that are separate and distinct from the panels of the interactive floor system.

**2**. The amusement system of claim **1** wherein said one or more targets also comprise a second subset of one or more panels that are each designated as a target panel to be stepped on by said participants, and the controller is configured to trigger illumination of each target panel by the illumination system in a manner distinguishable from all other panels of the array, including the hazard panels; and to monitor for said actuation of the one or more targets, at least in part, by monitoring output from the sensing system for actuation of each target panel.

**3**. The amusement system of claim **2** wherein the controller is configured to designate a third subset of the panels as safe panels to which the participants are to travel after actuation of all designated targets to denote participant completion of the gameplay sequence, and to trigger illumination of the safe panels via the illumination system in a manner distinguishable from all other panels of the array, including the hazard and target panels.

**4**. The amusement system of claim **1** wherein said one or more target devices are mounted in elevated relation above said panels of the interactive floor system.

**5**. The amusement system of claim **1** wherein said one or more target devices comprise at least one wall-mounted target device mounted on at least one upright wall neighbouring the array of panels.

**6**. The amusement system of claim **5** wherein said interactive floor system resides in an enclosed room having an interior space delimited by a plurality of perimeter walls spanning around the array of the panels, and the at least one wall-mounted target device is mounted to at least one of said perimeter walls.

**7**. The amusement system of claim **1** wherein the controller is configured to, during said gameplay sequence, vary the subset of panels that are designated and distinctly

illuminated as said hazard panels, and to accordingly vary which of the panels are monitored for detected participant presence.

**8**. The amusement system of claim **1** wherein the array of panels reside in an enclosed room, and a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

**9**. An amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein:

the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;

trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence; and

the controller is configured to designate another subset of the panels as safe panels to which the participants are to travel in a final completion step of the gameplay sequence, and to trigger illumination of the safe panels via the illumination system in a manner distinguishable from all other panels of the array, including said hazard panels.

**10**. The amusement system of claim **9** wherein the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants of one or more targets, of which the participants are tasked with actuation to successfully complete said gameplay sequence.

**11**. The amusement system of claim **10** wherein said one or more targets comprise a second subset of one or more panels that are each designated as a target panel to be stepped on by said participants, and the controller is configured to trigger illumination of each target panel by the illumination system in a manner distinguishable from all other panels of the array, including the hazard panels; and to monitor for said actuation of the one or more targets, at least in part, by monitoring output from the sensing system for actuation of each target panel.

**12**. The amusement system of claim **9** wherein the controller is configured to, during said gameplay sequence, vary the subset of panels that are designated and distinctly illuminated as said hazard panels, and to accordingly vary which of the panels are monitored for detected participant presence.

**13**. The amusement system of claim **9** wherein the array of panels reside in an enclosed room, and a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

**14**. An amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein:

the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;

trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence; and

the controller is configured to, during said gameplay sequence:

vary the subset of panels that are designated and distinctly illuminated as said hazard panels, and to accordingly vary which of the panels are monitored for detected participant presence; and

generate at least one moving hazard by sequentially illuminating then de-illuminating an individual panel, or group of panels, in serial fashion across the array.

**15**. The amusement system of claim **14** wherein the controller is configured to generate multiple moving hazards, of which at least two moving hazards are each executed by sequential illumination and de-illumination of a respective set of one or more panels in serial fashion in a different respective direction across the array.

**16**. The amusement system of claim **14** wherein the controller is configured to maintain a gameplay score tally and/or gameplay status meter, and to attribute a penalty thereto in response to detected participant presence on any of the hazard panels.

**17**. The amusement system of claim **14** wherein the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants

of one or more targets, of which the participants are tasked with actuation to successfully complete said gameplay sequence.

**18**. The amusement system of claim **17** wherein said one or more targets comprise a second subset of one or more panels that are each designated as a target panel to be stepped on by said participants, and the controller is configured to trigger illumination of each target panel by the illumination system in a manner distinguishable from all other panels of the array, including the hazard panels; and to monitor for said actuation of the one or more targets, at least in part, by monitoring output from the sensing system for actuation of each target panel.

**19**. The amusement system of claim **18** wherein the controller is configured to designate a third subset of the panels as safe panels to which the participants are to travel after actuation of all designated targets to denote participant completion of the gameplay sequence, and to trigger illumination of the safe panels via the illumination system in a manner distinguishable from all other panels of the array, including the hazard and target panels.

**20**. The amusement system of claim **14** wherein the array of panels reside in an enclosed room, and a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

* * * * *

# EXHIBIT D

**From:** Jeff Willy
**To:** Steven Miller
[redacted] [redacted]
**Subject:** Re: The attraction everyone is talking about at IAAPA!
**Date:** Friday, November 1, 2024 12:30:02 PM

---

Roger that. [redacted] The CEO of Activate sending an email from a different alias, [redacted] as if he wasn't their CEO.

Regards,
Jeff

Sent from my iPad

On Nov 1, 2024, at 12:02 PM, Steven Miller <sjmiller@ipathip.com> wrote:

**ATTORNEY-CLIENT PRIVILEGED CONFIDENTIAL ATTORNEY WORK PRODUCT**

Hi Jeff,

[redacted] please forward/otherwise let me know if you receive other emails or communications like this, from anyone.

If Activate or anyone else raises an issue with IAPPA, let me know right away and we'll promptly address it like we did last year.

Best,
Steve M.

*Steven J. Miller, M.D., J.D.*
Partner | IPath, PLC
15333 North Pima Road, Suite 305 Scottsdale, AZ 85260
Office: (617) 370-5740 | Fax: (833) 320-00871
sjmiller@ipathip.com | www.ipathip.com

<image001.png>

**********************************************************************
This Electronic Transmission Is Intended Only For The Addressee Shown Above. It May Contain Information That Is Privileged, Confidential Or Otherwise Protected From Disclosure. Any Review, Dissemination Or Use Of This Transmission Or Its Contents By Persons Other Than The Addressee Is Strictly Prohibited. If You Received This Message In Error, Please Delete the E-Mail And Notify Us Immediately By Telephone Or By Reply E-Mail.
**********************************************************************

---

**From:** Jeff Willy <jeff@pixel-us.com>
**Sent:** Thursday, October 31, 2024 10:07 AM
**To:** Steven Miller <sjmiller@ipathip.com>
**Subject:** Fwd: The attraction everyone is talking about at IAAPA!

Hey Steve,

Just received this email. I looked him up and I think he's actually the founder of Activate. I have not replied to him.

<image002.png>

Regards,
Jeff

Sent from my iPhone

Begin forwarded message:

> **From:** "adam therealescape.ca" <adam@therealescape.ca>
> **Date:** October 31, 2024 at 10:56:12 AM MDT
> **To:** Pixel Games USA <info@pixel-us.com>
> **Subject: Re: The attraction everyone is talking about at IAAPA!**
>
> I thought there was a patent infringement on this from Activate Games??? Do they know you're sending this out? Does Iaapa legal know?
>
> Forwarding it now.
>
> > On Oct 24, 2024, at 7:29 PM, Pixel Games USA <info@pixel-us.com> wrote:



# It's the arcade attraction everyone is talking about.

## IAAPA EXPO | **BOOTH#: 4078** | NOV. 19-22

Dont miss the interactive, multi-game, addicting, attendant free gaming floor attraction that everyone is going crazy about. Come play the product yourself, meet the team, and schedule your install at booth #4078

## Why our operators love Pixel Games:

**Easy to operate & high ROI**

**Turn-key Attraction**

**Attendant Free**

Shipped & supported in the USA

**Plus so much more**

★★★★★

"It's going great! Every single customer that walks past the Pixel floor becomes immediately curious as to what it is. I've seen many small groups of individuals (2-5) have a blast using the different game modes, the children especially seem to have the most fun!"

*- Spy Ninjas HQ | Vegas, NV*

**Request Quote**

**PIXEL GAMES USA**

*Copyright © Square Entertainment LLC 2024, SIP License and Rights Management UG. All rights reserved.* You are receiving this email because you are subscribed to Laserforce's news & updates.

Add us to your address book

Laserforce Laser Tag
4/93 Rivergate Place
Murarrie, Queensland 4172
Australia

Add us to your address book

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

# EXHIBIT E

**From:** Jeff Willy
**To:** Philipp Hacker Pixel Games USA; Steven Miller
**Subject:** Fwd: New Pixel Games Quote Request
**Date:** Monday, November 18, 2024 7:42:38 AM

Interesting. Actionable?Fishing?

Sent from my iPhone

Begin forwarded message:

> **From:** Pixel Games USA <NoReply@pixel-us.com>
> **Date:** November 18, 2024 at 7:17:28 AM EST
> **To:** jeff@pixel-us.com
> **Subject: New Pixel Games Quote Request**

Pixel US

## [redacted] requested a Pixel Games quote!

Here is the info they submitted through the quote form on https://pixel-us.com/

*Submission Date:11/18/2024 / Submission Time:12:17:28 pm, GMT+0000*

**First & Last Name:** [redacted]

**Email:** [redacted]@gmail.com

**Phone #:** [redacted]

**Business / Location Name:**

**Business Web:**

**Address:** , , , , , United States of America (USA)

---

**How did you hear about us?*** Web Search

---

**Additional notes:** I got a note that only the activate from Canada can sell the franchise to USA . How do you handle this ?

---

Square Entertainment LLC © 2024 SIP License and Rights Management UG. All rights reserved.

# APPENDIX F

Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

**CONFIDENTIAL OPINION OF COUNSEL**
**SUBJECT TO ATTORNEY-CLIENT PRIVILEGE**

**June 1, 2023**

Mr. Philipp Hacker
Pixel Games, GmbH
Leipziger Chaussee 23, 39120
Magdeburg, Germany
info@pixelgames.com

**Re: Activate Games Inc. U.S. patent no. 11,511,171 B2 titled "Interactive Floor and Amusement Systems and Methods Employing Same" (the "171 Patent")**

Dear Philipp,

You have asked me on behalf of Pixel Games, GmbH, to review U.S. patent no. 11,511,171 B2 to Activate Games Inc. (hereinafter, "Activate") and provide a legal opinion with respect to certain products (the "Products") contemplated for manufacture and sale in the United States by Pixel Games, GmbH (hereinafter, "Pixel"). Specifically, you have asked me to address whether any of Pixel's Products infringe on any of the claims of the '171 Patent. A copy of the '171 Patent is attached to this letter as "Appendix A."

Activate is a Canadian corporation with headquarters in Winnipeg, Manitoba Canada. Pixel is a German corporation headquartered in Magdeburg Germany.

## EXECUTIVE SUMMARY

Pixels Products do not literally infringe on any claims of the '171 patent. Established law surrounding "means-plus-function" claiming in the U.S. limits the claim scope of independent claims 1, 9, and 14 reciting a "sensing system" to the sole mechanism of "sensing" disclosed in the specification and drawings of the '171 patent–a mechanical switch pressure sensor. Pixel's products to not incorporate a mechanical switch pressure sensor, or any pressure sensor, within the allowable scope of Activate's "sensing system." For at least this reason, claims 1, 9, and 14 do not read on Pixel's Products. Therefore, Pixels Products do not infringe the '171 patent.

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

Based on this analysis, as set forth in more detail below, a properly informed court should find that the manufacture, offer for sale, or importation of the Products would not directly infringe under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, any claim of the '171 Patent. Please note, however, that patent infringement determinations, especially in litigation, are uncertain and much depends on the aggressiveness of the owner of the '171 Patent, trial counsel, witnesses, additional facts that may be uncovered during discovery, the judge, and a jury requested.

This Opinion Letter confirms a previous oral opinion of non-infringement provided to Pixel by counsel undersigned on or about May 3, 2023.

## LAW SURROUNDING INFRINGEMENT

Patent infringement is governed by 35 U.S.C. §271(a) which provides that one who, without permission, "[M]akes, uses, offers to sell, or sells any patent invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Only claims of an issued patent may be infringed. Infringement is determined on a claim-by-claim basis, meaning one or more claims of an issued patent may be infringed without infringement of other of the patent's claims.

Patents contain two general claim types: (1) independent; and (2) dependent. An independent claim stands alone and is analyzed and interpreted by itself. A dependent claim, however, must be read with the independent claim or chain of dependent and independent claims from which it depends. For a product to infringe on a dependent claim it will necessarily infringe on the independent claim and any additional dependent claim(s) from which it depends. Consequently, a product not infringing any independent claims will not infringe any dependent claims within the patent.

For a product to infringe on an issued claim, ***each and every element*** recited by the claim must be manifest by the product and the claim is said to "read on" the product. If a claim recites ten elements and the product manifests nine of these but not one, the product does not infringe the claim. To determine whether a product infringes on a claim of an issued patent, therefore, requires analysis of every recited element of each patent claim.

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

IPath
Biotech and medical device intellectual property management

## LAW SURROUNDING CLAIM SCOPE

The law addressing requirements for a patent is found in 35 U.S.C. §§101, 102, 103, and 112. "There are three legal requisites to a valid patent: utility, novelty, and nonobviousness."[1] Section 101 of 35 U.S.C. addresses utility, section 102 novelty, and section 103 nonobviousness. Section 112 further requires the patent specification shall "contain a written description of the invention . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same . . .."[2]

A claim must be drafted in a manner that informs a person of skill in the relevant art at the time of the invention how to make and use the invention. Claim language is intrinsically connected to the specification and cannot be considered separately. "Claims must be read in view of the specification, of which they are a part."[3] A claim, therefore, must distinctly set forth the metes and bounds of the claimed invention. It cannot be vague or indefinite. "The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history."[4]

A claim element may also be expressed based not its physical structure but on its function "as a means or step for performing a specified function without the recital of structure . . .." [5] This is known as "means plus function" claim language. Functional limitations recited by a claim must be supported by disclosures in the specification and drawings of the patent which must enable the full scope of the invention as defined by its claims. "If a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class." [6] "The more one claims, the more one must enable."[7]

[1] *General Motors Corp. v. Toyota Motor Co.*, 667 F.2d 504, 505 (Fed. Cir. 1981). [2] 35 U.S.C. §112 (a).
[3] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).
[4] *Moba v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003).
[5] 35 U.S.C. §112(f).
[6] *Amgen Inc., v. Sanofi*, et al., 143 S.Ct. 1243, 1254 (2023).
[7] *Id.*

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

The U.S. Supreme Court recently issued a sweeping opinion addressing the question of enablement generally in *Amgen Inc., et al., v. Sanofi, et* al.[8] Justice Gorsuch, who drafted the Court's majority opinion, supports today's claim enablement standard as it relates to claim scope by citing three historical Supreme Court cases. These illustrative cases involve no less than the original patents claiming a telegraph, an electric light, and furniture glue. Their holdings and rationale are applicable to the independent claims of the '171 patent.

Samuel Morse was issued a U.S. patent for his telegraph in 1832, claiming "the use of the motive power of the electric or galvanic current . . . *however developed* for marking or printing intelligible characters, signs, or letters, at any distances."[9] *(Emphasis* added.). "The problem was that it covered *all* means of achieving telegraphic communication, yet Morse had not described how to make and use them all.[10]

William Sawyer and Albon Man obtained a patent for an electric lamp, claiming an "incandescing conductor" of "carbonized fibrous or textile material."[11] When Thomas Edison later introduced his incandescent lamp using a bamboo fiber filament, Sawyer and Man sued Edison for patent infringement. The Court held Sawyer and Man's claim to an "incandescing conductor [of] carbonized fibrous or textile material" was too broad for what few enabling disclosures were present in the specification, requiring substantial "painstaking" experimentation to identify what specific fibrous material(s) would work. The court concluded that Sawyer and Man "claimed much but enabled little"[12] and the claim scope consequently did not cover Edison's incandescent bamboo fiber. "The fact that paper happens to belong to the fibrous kingdom did not invest [Sawyer and Man] with sovereignty over this entire kingdom."[13]

The Perkins Glue Company patented a starch-based glue it had developed which was similar in properties to animal glue for making wood veneers for furniture. The issued patent claim, however, recited all "starch glue which, [when] combined with about three parts or less by

---

[8] *Id.*
[9] O'Reilly v. Morse, 15 How. 62 at 112 (1854).
[10] *Amgen*, at 1252.
[11] 16 S.Ct 75 (1895).
[12] *Amgen*, at 1253.
[13] 16 S .Ct. 75.

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

weight of water, will have substantially the same properties as animal glue."[14] The Court in this case held the claim to be completely invalid for lack of any sufficiently enabling disclosures in the written description.

Assigning a broad scope to a patent claim supported in the written description by only one or a few examples is possible if disclosing "some general quality may reliably enable a person skilled in the art to make and use all of what is claimed . . .."[15] The degree of disclosure necessary to enable claim scope depends on the nature of the invention and the underlying art.[16]

Means-Plus-Function Claims

Means-plus-function claim language recites a claim limitation based on the function of the limitation rather than its structure. The determination of whether a means-plus-function claim limitation is present requires first determining whether explicit means-plus-function claim language is used (i.e., "a means for . . ."); and second, if the explicit language is not used, whether the claim recites sufficiently definite structure for a person of ordinary skill in the art to understand a sufficiently definite structure. This is followed by a determination of what structure, if any, disclosed in the written disclosures corresponds to the claimed function.[17] A means-plus-function claim limitation need not use the word "means" if the claim does not provide any indication of structure for performing the claimed function.[18]

## U.S. PATENT NO. 11,511,171 (the "171 Patent")

General

The '171 Patent to Activate involves an interactive floor and amusement system and methods of employing same. The subject matter includes an interactive floor with an array of panels laid out in one or more grids to create an interactive floor surface with an illumination

[14] 48 S.Ct. 474.
[15] Amgen, at 1255.
[16] *Id.*
[17] *See* Dylan v. Target Corporation, *28 F.4th 1360, 1365 (2022) (referencing Williamson v. Citrix Online, 792 F.3d* 1339 (Fed. Cir. 2015).
[18] Rain Computing, Inc., v. Samsung Electronics America, Inc., 989 F,3d 1002, 1006 (Fed. Cir. 2021).

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

system to individually illuminate each floor panel and a sensing system to detect the presence of any participant atop any floor panel. Other related features are also disclosed.

The '171 Patent has twenty (20) claims. Claim numbers 1, 9, and 14 are independent. These claims are fully set forth in attached Appendix 1. Independent claim 1 is representative and is presented below:

The text from claim 1 is presented below:

*1. An amusement system comprising:*

*an interactive floor system comprising:*

*an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;*

*an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and*

***a sensing system operable to detect presence of any participant atop any panel of the array****, independently of whether presence of a participant is detected on any other panel in the array;*

*a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;*

*wherein:*

*the controller is configured to execute a gameplay sequence, and to execute the following steps therein:*

*designate a subset of the panels as hazard panels to be avoided by participants;*

*trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;*

*monitor for detected participant presence on any of the hazard panels; and*

*in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence;*

*the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants of one or more targets, of which the*

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

*participants are tasked with actuation to successfully complete said gameplay sequence; and*

*said one or more targets comprise one or more target devices that are separate and distinct from the panels of the interactive floor system.*

Claim 1 is representative of independent claim of the '171 patent because claim 1 recites four central elements of Activate's amusement system also recited by claims 9 and 14; namely, (1) an array of generally horizontal, coplanar panels;

(2) an illumination system to individually illuminate each panel independently of any other panel; and

(3) ***a sensing system "operable to detect presence of any participant atop any panel of the array . . ..***"

Prosection History Summary

The United States Patent and Trademark Office ("USPTO") 378-page prosecution history of the '171 Patent was carefully reviewed. In summary, the application was filed on January 14, 2021 and claimed priority to an earlier-filed Canadian patent application (number 3,068,840) filed on January 20, 2020.[19]

The USPTO issued a single Examiner's Office Action on August 23, 2022 rejecting some claims and indicating allowable subject matter in others.

Claim 1 of the application as originally filed recited the limitation "a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array . . .." This is identical to the text reciting this limitation in claims 1, 9, and 14 of the issued patent and was not changed by amendment during prosecution. Claim 1 was initially rejected, however, citing anticipation under § 102 by U.S. application no. 2006/0154726 to Weston ("Multi-Layered Interactive Play Experience"). Applicant did not argue this rejection but rather simply amended

[19] An additional, independent prior art search was not conducted by Pixel prior to drafting this Opinion Letter nor was any prior art not cited by the Examiner's Office Action dated August 23, 2022 examined or form the basis for the conclusions stated in this Opinion Letter. Counsel undersigned knows of no additional prior art previously known to Pixel, including its owners or employees.

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

the claim to incorporate Examiner-identified allowable subject matter from dependent claims. Additional prior art was cited in an obviousness rejection of claims 14 and 18–23, however the Examiner did not base any of these rejections on the sensing-system limitation recited by claims 9 and 14 of the '171 patent. There is not an information disclosure statement Form SB-08 ("IDS") filed by the Applicant in the USPTO file wrapper.

Claim 9 was filed as a dependent claim with allowable subject matter and was amended to independent form by adding the "operable to detect presence" limitation (and other original claim 1 limitations). Claim 14 (original claim 20) was filed with this limitation and not amended during prosecution. All of the Applicant's claim amendments in response to this office action were in the form of incorporating allowable subject matter identified in dependent claims into independent claims resulting in allowance.

The Examiner in this case did not issue a § 112 rejection.

The patent issued November 29, 2022.

## THE (PIXEL) PRODUCTS

Pixel makes a variety of arcade-based amusement products, including tiles for an interactive floor game. The tiles are used to create an immersive, interactive space, such as within an amusement center, wherein one or more players play a game by responding to cues from illuminated floor tiles and other components of the system. Depictions of an example embodiment of Pixel's floor game interactive illuminated tile array is shown below:



A sensor disposed inside each tile detects when a player is standing or stepping on the tile. Currently available tiles for interactive floor game installations utilize mechanical pressure

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

or piezoresistive pressure sensors for this function. Both have limitations. Mechanical sensors are subject to wear. Both mechanical and piezoresistive sensors require a fixed, minimum downward force to detect player contact with a tile. This force is constant, regardless of whether the player is a nursery school child or a 300-pound football player. Consequently, there are multiple disadvantages to currently available tile systems for installation of a tile array in an interactive arcade room installation.

Pixel addressed the need for versatility in "tuning" the sensor of each tile by incorporating a capacitive sensor into its Products. Pixel's use of a capacitive sensor offers many advantages over the prior art, such as higher sensitivity, tunability (through signal processing software executed by the game control system), and much lower power requirements. In some embodiments, therefore, a minimum threshold required for the game controller to register the correct response when a player contacts an interactive feature can be "tuned" across a range of values specific to different types and duration of player contact. This tunability allows for adjusting the game for play by small children versus adults, for example.

## ANALYSIS

Claim Construction

Claim terms are generally given their ordinary and customary meaning to a person of ordinary skill in the art at the time of the inventions, which is generally the patent application's effective filing date.[20] The following were considered in determining the proper claim construction: (1) the claim language itself; (2) the entire '171 Patent, including its specification and drawings; and (3) the '171 Patent's prosecution history, including the cited prior art.

The following extrinsic evidence, which is useful in defining how the scope of a "sensing system" would be understood according to its ordinary meaning to a person of ordinary skill in the art, is useful in determining the meaning of "sensing system":

[20] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

IPath
Biotech and medical device intellectual property management

- Vocabulary.com online dictionary (Sensing - Definition, Meaning & Synonyms | Vocabulary.com) definition of "sensing": "(noun) the perception that something has occurred or some state exists"
- Vocabulary.com online dictionary (System Definition, Meaning & Synonyms | Vocabulary.com) definition of "system": "(noun) instrumentality that combines interrelated interacting artifacts designed to work as a coherent entity" for example, "*he bought a new stereo **system***"

This initially broad claim construction is appropriate because Applicant has not limited the scope of these terms, either in the written disclosures or prosecution history of the '171 Patent.

Moreover, claims 1, 9, and 14 should be construed as means-plus-function claims under 35 U.S.C. § 112(f) because Applicant uses the term "sensing system" to broadly define a function rather than an entire family of physical structures. The claims do not use the word "means." Regardless, the claims recite function (sensing) without reciting sufficient structure ("system") for performing the sensing function. The phrase "a sensing system operable to detect presence of any participant atop any panel of the array" of claims 1, 9, and 14 plainly recites "sensing system" not based on what a sensing system is, but rather on what a sensing system does.

It is necessary, therefore, to look to the specification and drawings to determine whether disclosures of structure (if any) for a "sensing system" are sufficient to enable one of ordinary skill at the time of the invention to fully practice the limitless breadth of "sensing" and "system" provided under the plain meaning of claims 1, 9, and 14.

The '171 Patent's written description does not provide sufficiently definite structure for any member of this family, save for a single type of mechanical switch. The claim term "sensing system" ***is not mentioned a single time*** in the Detailed Description section of the specification. The Detailed Description does mention "sensing" six times–once as "sensing arrangement" and five times as "sensing circuit."

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

A single, albeit detailed, disclosure of physical structure associated with "sensing" is found in the '171 Patent at column 6, line 44–column 7, line 15, reproduced below:

> On each of the four sides of each cell, the respective structural member 66, 68 of the cell base has a conductive contact plate 80 of a participant-sensing circuit mounted thereon at a generally central location between the two spacer pads 74 on that side of the cells base. The contact plate 80 is thinner than the spacer pads 74, whereby the top surface of the contact plate 80 resides at slightly lesser elevation than the top surfaces the spacer pads 74, and thus also at lesser elevation than the hook or loop fastener elements 76 mounted on the spacer pads 74.
>
> FIGS. 12 through 14 show, in isolation, a singular respective floor panel 62 of one of the cells. The underside of the panel 62, in addition to the hook or loop fastener elements 78 adhesively attached at the comers of the panel, features four conducive contact lugs 82 each secured to the panel in protruding relation from the underside thereof. The contact lugs 82 are situated at peripheral regions of the panel 62, each near a respective side of the panel's outer perimeter at a central distance along this respective perimeter side, whereby the contact lugs are suitably positioned to align with the four contact plates 80 that reside at midpoints of the four perimeter sides of the cell base. The protruding distance of the contact lugs 82 from the underside of the panel 62 is less than the vertical spacing that normally resides between the underside of the panel and the contact plates 80 on the cell base when the floor panel 62 is installed atop the cell base, but not subjected to the body weight of a participant, or any other participant-exerted downforce. ***Only when the floor panel 62 is subjected to such body weight or other downforce are the contact lugs 82 on the floor panel 62 displaced downwardly into touching and electrically conductive contact with the corresponding contact plates 80 on the cell base.*** Such downward displacement of the contact lugs 82 on the underside of the panel 62 under the exerted body weight or other downforce on the topside of the panel 62 may enabled by (a) a resilient compressibility of the spacer pads 74; (b) resilient flexibility of the floor panels 62; or (c) a combination thereof.

"The protruding distance of the contact lugs 82 from the underside of the panel 62 is less than the vertical spacing that normally resides between the underside of the panel and the contact plates 80 on the cell base" is understood by a plain reading of the text to indicate a displacement motion of panel 62 spanning the distance between the underside of panel 62 and contact plates 80 on the cell base is required to complete an electrical "sensing circuit." A person of skill will recognize this single disclosure of a structural element associated with the sensing function as a simple mechanical switch "only activated by a displacement force, i.e., "such body weight or other downforce." .In none of the remaining five uses of "sensing" does the Detailed Description

Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

(or elsewhere in the ‘171 Patent) describe a single additional or alternative structural element of a sensor, either alone or as part of the claimed “sensing system.”

Applicant appears to attempt broadening the scope of physical structures assembled to form a “sensing arrangement” at column 7, lines 23–36 by stating “It will also be appreciated that the particular type of switch or other sensing arrangement employed to detect participant presence atop a given cell may be varied without detriment to other inventive aspects of the disclosed invention.”

A broadened interpretation of “sensing system” is inappropriate, however, for two reasons. First, Applicant offers no disclosure or rationale to support expanding “sensing system” to include any sensor or switch beyond the mechanical switch described in cols. 6–7 as noted above. This is arguably not sufficient to enable a person of skill to use *all* sensing systems, whether currently available or yet to be developed, in its claimed game system. Second, because the disclosure of structure for a single embodiment of a sensing system is lengthy, detailed, and precise with respect to individual sub-structures, it can be inferred that this was the *only* sensing system structure possessed by inventor at the time of the invention.

Applicant may seek to claim its “sensing system” as any structure generating “the perception that something has occurred or some state exists” in the larger context of an “instrumentality that combines interrelated interacting artifacts designed to work as a coherent entity,” but broad protection requires broad enablement–which the ‘171 Patent fails to accomplish.

Applicant only identifies a mere single structural embodiment of to accomplish any sensing function as the invention. Applicant provides no evidence to support a broader claim scope beyond a simple mechanical contact switch.

Caselaw provides that “a specification may call for a reasonable amount of experimentation to make and use a patented invention.”[21] What is “reasonable” depends upon the technology and the minimum level of skill of one having skill in that technology.[22] The written

[21] *Amgen*, at 1255.
[22] *See id.*

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

IPath
Biotech and medical device intellectual property management

disclosures of the '171 Patent, however, contain no language whatsoever calling for or suggesting any amount of experimentation to determine which type of sensing system would work best for a room-space game having an interactive floor installation. The '171 Patent's written disclosures describe a single structural example of a component to accomplish "sensing" in great detail but *do not offer a single example* of alternative structures for use in the disclosed or any contemplated embodiments. This is at least highly suggestive that the Applicants never contemplated other structural elements to achieve the sensing function of claims 1, 9, and 14, much less incorporation of the capacitive sensors used by Pixel.

Pixel's capacitive sensors do not require application of weight, a downward force, or any force for activation. Additionally, Pixel's sensors are tunable through software code executed by Pixel's game controller. Although not assured, it would be unreasonable and contrary to existing caselaw for a court to bestow rights to the entire universe of sensors, particularly in view of Justice Gorsuch's recent majority opinion addressing this question in *Amgen*, to claims 1, 9, and 14 of the '171 patent.

Pixel's Products to not infringe on Activate's '171 patent because none of the three independent claims read on any of Pixel's products. This is at least because the Activate '171 Patent does not enable "a sensing system" utilizing the capacitive sensor employed by Pixel's Products.

Like Sawyer and Man, the Activate patent "claims much and enables little" with respect to its sensing system. The '171 patent's disclosures mention no common quality of "sensing the presence." It is not possible to cover all embodiments of "sensing the presence" without extensive experimentation.

///

**[Conclusion and signature**

**follow.]** ///

///

IPath
Biotech and medical device intellectual property management

Steven J. Miller, M.D., J.D.
15333 North Pima Road, STE 305
Scottsdale, AZ 85260
(617) 370-5730 | Fax: (833) 320-0071

## CONCLUSION

For at least the foregoing reasons discussed herein, Pixel's Products do not infringe on any claim of the '171 Patent to Activate Games, Inc.

Best regards,

Steven J. Miller, M.D., J.D.
IPath, PLC

Enc. Appendix A – U.S. patent no. 11,511,171 B2

# APPENDIX 1

US011511171B2

(12) **United States Patent**
**Schmidt**

(10) **Patent No.: US 11,511,171 B2**
(45) **Date of Patent: Nov. 29, 2022**

(54) **INTERACTIVE FLOOR AND AMUSEMENT SYSTEMS AND METHODS EMPLOYING SAME**

(71) Applicant: **Activate Games Inc.**, Winnipeg (CA)

(72) Inventor: **Adam Schmidt**, Winnipeg (CA)

(73) Assignee: **Activate Games Inc.**, Winnipeg (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 162 days.

(21) Appl. No.: **17/148,989**

(22) Filed: **Jan. 14, 2021**

(65) **Prior Publication Data**

US 2021/0220714 A1 Jul. 22, 2021

(30) **Foreign Application Priority Data**

Jan. 20, 2020 (CA) ................................ CA 3068840

(51) **Int. Cl.**

| | |
|---|---|
| ***A63B 67/00*** | (2006.01) |
| ***A63B 71/06*** | (2006.01) |
| ***E04F 15/02*** | (2006.01) |
| ***E04H 3/10*** | (2006.01) |
| ***E04B 5/46*** | (2006.01) |

(52) **U.S. Cl.**

CPC .......... ***A63B 67/00*** (2013.01); ***A63B 71/0669*** (2013.01); ***E04B 5/46*** (2013.01); ***E04F 15/02194*** (2013.01); ***E04H 3/10*** (2013.01); *A63B 2071/0694* (2013.01); *A63B 2220/801* (2013.01); *A63B 2225/74* (2020.08)

(58) **Field of Classification Search**

CPC ................ A63B 67/00; A63B 71/0669; A63B 2071/0694; A63B 2220/801; A63B 2225/74; E04B 5/46; E04B 5/14; E04B 5/48; E04F 15/02194; E04F 15/02405; E04F 15/02458; E04H 3/10; A63F 13/214; A63F 13/24; A63F 13/816; A63F 13/90

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2006/0154726 A1* 7/2006 Weston .................. A63F 13/12
463/36

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| AU | 2015406125 A1 * | 4/2017 | ............. | A63B 69/00 |
| CA | 2474132 A1 * | 5/2001 | ............. | E04F 15/04 |
| CN | 108352695 A * | 7/2018 | ........ | E04F 15/02405 |
| RU | 200789 U1 * | 11/2020 | ............. | E04C 2/427 |

* cited by examiner

*Primary Examiner* — Jeffrey S Vanderveen

(74) *Attorney, Agent, or Firm* — Kyle R Satterthwaite; Ryan W Dupuis; Ade & Company Inc.

(57) **ABSTRACT**

An amusement system features an interactive floor with an array of panels laid out in one or more grids to collectively define an interactive floor surface, an illumination system operable to individually illuminate each panel, and a sensing system operable to detect presence of any participant atop any panel. A base frame of the interactive floor is composed of a plurality of base modules seated on a subfloor, and supporting a respective panel for one or more cells of the interactive floor. The base modules are not directly fastened together, and instead are only intercoupled by perimeter seals applied over peripheral regions of the panels of neighbouring modules. Separation of the modules is constrained by surrounding walls of a room fully occupied by the interactive floor. In gameplay, some panels are distinctively illuminated as hazards to be avoided by participants, subject to penalty.

**20 Claims, 8 Drawing Sheets**



FIG. 1


10
14
32
30
28
16
EXIT
22
26
24
18
12
ENTRANCE
20

FIG. 2


14
24
28
26
16
18
22
20
12


14
32
30
28
202
206
204
200
16
18
22
20
208
210
26
12
TIME

FIG. 3


32
30
28
24
26
101
ENTRANCE
EXIT
TIME
20
22

FIG. 4


TIME
ENTRANCE
32
30
28
24
26
20
10'

FIG. 5


24A
26
94A
94B
94
62
92
60
90
66
64
88

FIG. 6


94
94B
94B
94A
94B
92
94B
92
60
92
62
92
64
74
64
66
88
74
76
90
66
74
76
88
88

FIG. 7


94B
94
94A
92
62
92
92
92
80
76
78
80
74
60
64
88
66
90

FIG. 8




FIG. 9




FIG. 10




FIG. 11




FIG. 12




FIG. 13




FIG. 14


30
Score Display
Life Displays
32
Target
Target
Target
28
28
Target
Target
Target
Target
28
28
28
28
24
Speakers
124
Exit Doorway (Sensor)
22
106
Computer
108
Target
28
Sign-In Displays
Entrance Doorway (Sensor + Electric Lock)
20
Battery Backup
110
Audio Control
112
Floor Control Boards
122
Main Power Breakers
120
Power Supplies
118
102
104
114
Microcontrollers
Component PCBs
116
100

FIG. 15


300
Start
Load initial map
302
Start Timer
304
Illuminate wall targets & floor cells according to loaded map:
Green = Safe
Red = Hazard
Blue = Target
306
Load next map
332
Timer up?
Yes
Game Lost
308
No
310
Blue cell actuated?
Yes
Deactivate
316
No
312
Wall target actuated?
Yes
Deactivate
318
No
314
Red cell actuated?
Yes
Decrement Life Meter
320
Lives remain?
Yes
No
322
Remaining wall/floor targets?
Yes
324
No
328
All participants at safe zone?
No
Alert participants
326
Yes
330
All maps completed?
No
Yes
Award points
334
Stop – Game Won

FIG. 16

# INTERACTIVE FLOOR AND AMUSEMENT SYSTEMS AND METHODS EMPLOYING SAME

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims foreign priority benefit under 35 U.S.C. 119(a) of Canadian Patent Application 3,068,840, filed Jan. 20, 2020, the entirety of which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to amusement attractions, and more particularly to amusement attractions in which participants interact with illuminable weight-responsive cells of an interactive floor system as part of an immersive live-action gaming experience.

## BACKGROUND

In recent years, escape rooms have become a popular form of immersive, live-action amusement attraction, providing an alternative to more conventional indoor amusement attractions such as laser tag, and to large scale amusement parks that are cost prohibitive, particularly in smaller markets and/or those where outdoor parks are subject to seasonal constraints in climates of notable temperature variation.

This demonstrates a yearning by the public for a greater variety of immersive amusement attractions and experiences, in response to which Applicant has developed a number of such immersive amusement attractions, which are the subjects of this and other concurrently filed patent applications.

The present application focuses on an immersive amusement attraction employing a novel interactive floor environment and related gameplay methodologies.

## SUMMARY OF THE INVENTION

According to a first aspect of the invention, there is provided an amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;



trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence.

According to a second aspect of the invention, there is provided an illuminable floor system comprising:

a plurality of base modules for placement atop a subfloor, each base module defining at least one cell;

a plurality of panels of equal quantity to a total number of cells possessed by said plurality of base modules for support atop one of the base modules in overlying relation to a respective one of the cells to define a respective area of a floor surface to be collectively defined by the plurality of panels, each panel comprising transparent or translucent material through which light is emittable upwardly from said floor surface, thereby illuminating the respective area of the floor surface;

for each cell, a respective illumination source supported on the base module and positioned to emit said light through the transparent or translucent material of the respective panel to illuminate the respective area of the floor surface; and

a supply of flexible perimeter seals provided in sufficient length and quantity to at least line a full perimeter of at least a subset of the base modules in overlaid relation atop a peripheral region of the respective panel of any perimeter-adjacent cell of each base module of said subset, while leaving exposed a larger unobstructed central region of said perimeter-adjacent cell to enable emission of said light from said unobstructed central region, whereby the perimeter seals create a respective rim of raised relation to the floor surface around the perimeter of each base module.

According to a third aspect of the invention, there is provided an immersive amusement system comprising:

a substantially enclosed room having an interior space and an entrance by which participants are admissible thereto;

an interactive floor system installed in said room, and comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of a floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array; and

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

## BRIEF DESCRIPTION OF THE DRAWINGS

One embodiment of the invention will now be described in conjunction with the accompanying drawings in which:

FIG. **1** is a perspective view of an immersive amusement environment employing an enclosed game room whose floor area is spanned wall-to-wall in both directions by an interactive floor featuring an array of illuminable, weight-responsive cells.

FIG. **2** is an overhead view of the game room of FIG. **1**.

FIG. **3** is another overhead view of the game room of FIG. **1**, schematically illustrating distinct illumination of different cells of the array to form different safe zones, hazards and targets to be interacted with by participants during gameplay.

FIG. **4** is a perspective view of a variant of the immersive amusement environment of FIG. **1**, illustrating optional variation in the size and layout of the enclosed game room.

FIG. **5** is an overhead view of the variant of FIG. **4**.

FIG. **6** is a perspective view of a section of the interactive floor from the game room of FIG. **1** or **4**.

FIG. **7** is a close-up partial perspective view of the floor section of FIG. **7**, with perimeter seals of some cells shown in exploded positions.

FIG. **8** is another close-up partial perspective view of the floor section of FIG. **7**, with additional componentry thereof shown in exploded positions to reveal internal assembly details of the floor section.

FIG. **9** is a perspective view of one of a plurality of identical base modules from which a base frame of the interactive floor is assembled, each module defining four neighbouring cells of the assembled interactive floor.

FIG. **10** is an overhead plan view of the base module of FIG. **9**.

FIG. **11** is a cross-sectional view of the base module of FIG. **10**, as viewed along line A-A thereof.

FIG. **12** is bottom perspective view of a floor panel that sits atop a respective cell of the base module to form a respective partial area of the overall interactive floor surface.

FIG. **13** is a top plan view of the floor panel of FIG. **12**.

FIG. **14** is a side elevational view of the floor panel of FIG. **12**.

FIG. **15** is a schematic illustration of a control system for the immersive amusement environment of FIG. **1** or **4**.

FIG. **16** is a flowchart illustrating a computer implemented process by which the control system of FIG. **15** executes a non-limiting exemplary game play session within the immersive amusement environment of the earlier figures.

## DETAILED DESCRIPTION

Referring to FIG. **1**, an immersive amusement environment is shown in the form of an enclosed game room **10** having an upright perimeter wall structure composed of a front wall **12**, an opposing rear wall **14**, a first side wall **16** and an opposing second side wall **18**. The front wall **12** features both an entrance **20** to the room and a separate exit **22** therefrom, for example near respective ends of the front wall **12**, though the game room may alternatively have a shared entrance/exit opening by which the game room's interior space is both entered and exited. In embodiments with a separate entrance and exit, they need not be located at the same wall.

The perimeter wall structure delimits a floor space of the room, a substantial entirety of which is occupied by an interactive floor system **24** defining an array of rectangular cells **26** that collectively span a substantially full dimension of the room's interior space in each of its two horizontal directions of measure. The cell array thus substantially spans both a width dimension of the room measured perpendicularly between the two opposing side walls **16**, **18**, and a depth dimension of the room measured perpendicularly between the opposing front and rear walls **12**, **14**. Accordingly, upon entry into the room, a participant in the amusement attraction will inherently be forced to stand upon the interactive floor, thus ensuring their mandatory interaction therewith during execution of a gameplay session inside the room.



In addition to the interactive floor **24**, the room **10** also features one or more interactive target devices **28** mounted in elevated relation above the interactive floor, whereby gameplay inside the room may involve both foot-based physical interaction with the interactive floor cells (stepping, jumping, foot-tapping etc.), and hand-based or other upper body physical interaction with the separate target devices **28**. Preferably there are multiple target devices **28** distributed around the room. In the illustrated embodiment, the target devices **28** are wall-mounted target devices, of which each perimeter wall of the room features at least one. Preferably there are multiple target devices **28** on all or some of the walls, optionally in varying quantities that may be proportional to the relative wall size, as demonstrated in the illustrated example where the longer rear wall **14** of the room has three target devices, while the relatively shorter side walls **16**, **18** each have only two target devices **18**. Though the front wall **12** is just as long as the rear wall **14** in the illustrated example of FIGS. **1** to **3**, the effective length of the front wall **12** is shortened by the provision of the entrance **20** and exit **22** in this front wall **12**, which therefore has a reduced quantity of target devices relative to the opposing rear wall **14**, and particularly only one target device in the illustrated example. That being said, the quantity of targets need not necessarily be reduced on walls of shorter true length or effective length. Each target device **28** may be a push-button device, touch-sensitive panel, or any other electronic device capable of receiving a physical input denoting an actuation of said device, preferably via handpress or other upper body interaction by a participant, though contact with a raised foot, knee, hip or other body part may optionally be employed by participants.

As can be seen in FIG. **1**, in addition to the target devices, **28** the interior space of the game room **10** in the illustrated embodiment also includes at least one performance display operable to display performance feedback to the participant (s) during a gameplay session. The performance display(s) may, for example, show one or more of: a score tally of incrementing/decrementing points values during successful completion or failure of assigned tasks during gameplay; a running timer; and/or a status meter whose level is incremented or decremented in response to detected failures, similar to a life-bar or health-meter of a video game. In the illustrated embodiment, instead of maintaining a separate score tally, a countdown timer is alone used to both limit the duration of a gameplay session, and to at least partially govern a scoring scheme under which points are only awarded at the end of the gameplay session if all assigned tasks are completed before expiry of the countdown timer. If the countdown timer expires and any assigned task remains incomplete, the participant(s) is/are deemed to have lost the game, and no points are awarded. If all assigned tasks are completed before expiry of the countdown timer, then the participant(s) is/are deemed to have won the game, and is/are awarded a score value equal to the value of the countdown timer at the point in time when the final task was completed. If the life/health status of the status meter reaches zero before expiry of the countdown timer, the gameplay session is terminated prematurely, with the par-

ticipant(s) being deemed to have lost the game, and therefore being awarded no points regardless of the value of the countdown timer at the premature termination of the gameplay session.

In the illustrated example, the running value of the countdown timer is shown on a score display **30**, for example a wall-mounted flat-screen monitor, and the status meter is shown in a separate status display **32**, for example in the form of a plurality of discrete illuminable indicators each representing a respective life or health point that changes from one status to another (lit or unlit) in response to a detected gameplay failure. For example, a series of heart-shaped indicators may initially occupy a fully lit state representing a full-life or full-health status of maximum lives or hit-points, and then be turned off one-by-one in response to each gameplay failure detected in the game session, until none of the indicators are lit. Alternatively, rather than the discrete indicators being heart-shaped to denote health or livelihood when illuminated, they may be X-shaped or skull-shaped to denote health damage or loss of life, thus all starting in an unlit state and then being illuminated one-by-one in response to gameplay failures until all indicators are illuminated. Either way, once all the indicators have changed state, this denotes a loss of the game by its participants, i.e. a "game over" status. The status display **32** may optionally be incorporated into the score display **30**. Instead of using the timer for one-time score determination at the end of a won game, an accruing score tally may be instead maintained independently of the timer during the gameplay session, in which case the running score tally may be shown on the score display **30**, optionally together with the running countdown timer.

FIG. **6** illustrates a section **24**A of the interactive floor **24** in isolation from the room **10**, from which it can be seen that the floor features a base frame **60** for supporting all other components of the interactive floor **24** atop the underlying room floor, which is also referred to herein as a subfloor to distinguish over the floor surface defined by the interactive floor system installed atop the room floor. Atop the base frame **60** are rested a plurality of floor panels **62** placed in closely neighbouring relation to one another in both of the two horizontal dimensions spanned by the underlying base frame **60** so that the topside of the base frame **60** is spanned by rows of such floor panels **62** in both directions. Each rectangular (preferably square) floor panel **62** occupies a corresponding rectangular (preferably square) area of the underlying base frame **60**, which together cooperatively denote a respective rectangular cell **26** of the interactive floor.

FIG. **9** shows an individual base module **64**, a plurality of which are used to assembled the overall base frame **60** of the interactive floor **24**. In the illustrated example, each base module defines a set of four respective bases for four neighbouring cells **26** of the interactive floor, laid out in a 2×2 rectangular array. An outer perimeter of the base module **64** is composed of four linear perimeter members **66** connected end-to-end at right angles to one another to define the overall rectangular outer perimeter of the base module **64**, and thereby also delimiting a rectangular interior space of the base module **64**. A set of linear divider members **68** each span perpendicularly between two opposing perimeter members at midpoints therealong, and thereby divide the overall interior space of the module into four smaller rectangular spaces **70**, each belonging to a respective one of the module's four cells. In the illustrated example, based on prototypes whose perimeter and divider members are composed of wooden 2×4s, the divider members **68** are doubled up in



adjacently abutting pairs, whereby two interior sides of each cell base are each defined by a respective half of a divider member, instead of sharing this half of a same divider member with the adjacent side of a neighbouring cell. That being said, shared dividers members may be employed in other variants of the module, which need not necessary be of wooden lumber construction, and may for example may be of molded plastic construction. The two outer sides of each cell base are each defined by a respective half of one of the outer perimeter members **66** of the module **64**.

The base module **64** thus defines four rectangular cell bases each having a rectangular interior space **70** bound on four sides by structural members **66**, **68** of the base module **64**. On all four sides of this interior space **70**, an inner face of the respective structural member **66**, **68** on the side thereof facing into this interior space **70** is equipped with a respective length of RGB LED strip lighting **72**. This strip lighting thus denotes a respective multi-colour illumination source of the cell that is capable of illuminating this interior space **70** of the cell in three different colours (Red, Green, Blue). The respective floor panel **62** of each cell is made of a transparent, or more preferably translucent, material enabling light transmission therethrough and capable of supporting the weight of human participants of varying age and size without permanent deformation. In one non-limiting example, the floor panels are made of translucent high-density polyethylene (HDPE), though other materials, preferably of polymeric composition, may alternatively be employed. Accordingly, activation of the LED strip lighting **72**, or other multi-colour illumination device, of any cell will transmit light upwardly through the at least translucent material of the floor panel **62**, thus emitting coloured light from the topside the panel **62** to illuminate the respective cell of the interactive floor.

Each cell base features a respective set of spacer pads **74** mounted atop its structural members **66**, **68** at all four corners of the cell for the purpose of supporting the respective panel **62** in slightly elevated relation above the structural members **66**, **68** of the base module **64**. In the illustrated embodiment, each panel **62** is secured to the underlying cell base via cooperation of hook and loop fastener elements **76**, **78** attached to the topsides of the base's spacer pads **74** and to the underside of the cell's floor panel **62** near the four corners thereof. On each of the four sides of each cell, the respective structural member **66**, **68** of the cell base has a conductive contact plate **80** of a participant-sensing circuit mounted thereon at a generally central location between the two spacer pads **74** on that side of the cells base. The contact plate **80** is thinner than the spacer pads **74**, whereby the top surface of the contact plate **80** resides at slightly lesser elevation than the top surfaces the spacer pads **74**, and thus also at lesser elevation than the hook or loop fastener elements **76** mounted on the spacer pads **74**.

FIGS. **12** through **14** show, in isolation, a singular respective floor panel **62** of one of the cells. The underside of the panel **62**, in addition to the hook or loop fastener elements **78** adhesively attached at the corners of the panel, features four conducive contact lugs **82** each secured to the panel in protruding relation from the underside thereof. The contact lugs **82** are situated at peripheral regions of the panel **62**, each near a respective side of the panel's outer perimeter at a central distance along this respective perimeter side, whereby the contact lugs are suitably positioned to align with the four contact plates **80** that reside at midpoints of the four perimeter sides of the cell base. The protruding distance of the contact lugs **82** from the underside of the panel **62** is

less than the vertical spacing that normally resides between the underside of the panel and the contact plates **80** on the cell base when the floor panel **62** is installed atop the cell base, but not subjected to the body weight of a participant, or any other participant-exerted downforce. Only when the floor panel **62** is subjected to such body weight or other downforce are the contact lugs **82** on the floor panel **62** displaced downwardly into touching and electrically conductive contact with the corresponding contact plates **80** on the cell base. Such downward displacement of the contact lugs **82** on the underside of the panel **62** under the exerted body weight or other downforce on the topside of the panel **62** may enabled by (a) a resilient compressibility of the spacer pads **74**; (b) resilient flexibility of the floor panels **62**; or (c) a combination thereof.

As shown in FIGS. **12** to **14**, a set lead wires **84** are connected to the contact lugs **82** from the interior cell space **70** beneath the panel **62**, just as another set of lead wires **86** are likewise connected to the contact plates **80** of the cell base from within the interior cell space **70**, as shown in FIGS. **9** and **10**. Each contact lug **82** and corresponding contact plate **80** form a normally-open switch in a respective branch of a participant-detection circuit that is closed when a participant stands on, steps on or otherwise exerts body weight or other downforce on the respective floor panel **62** of a cell. The illustrated embodiment employs four such normally-open switches, each in a respective parallel branch of the sensing circuit, and each at a respective side of the rectangular cell, to ensure confident detection regardless of where the body weight or other downforce is exerted or concentrated on the panel, but it will be appreciated that the number of switches used may be varied. It will also be appreciated that the particular type of switch or other sensing arrangement employed to detect participant presence atop a given cell may be varied without detriment to other inventive aspects of the disclosed invention. Likewise, the type of light source used to achieve multi-colour illumination of each cell may be varied from the particular use of RGB strip lighting mounted around the perimeter of the interior space **70** of the cell base. For example, one could alternatively employ various designs known in the prior art for the construction of interactive, illuminable dance floors.

The lead wires from the four contact plates **80**, four contact lugs **82**, and LED strip lighting of the cell, are preferably bundled together in a respective singular wiring harness **88** for the given cell, as demonstrated by FIG. **9** where the four-cell module **64** can be seen to have four respective wiring harnesses **88**, one for each individual cell. Each wiring harness **88** is plugged into a respective PCB control board for that particular cell, on which a micro controller operates to control the illumination status of LED strip lighting **72** between off, red, green and blue states; and to detect the closure of any of the normally open switches on the sensing circuit to thereby confirm the presence of participant body weight or exerted downforce on the cell's floor panel **62**. The structural members **66**, **68** of each module **64** have small riser feet **90** attached to the undersides thereof at the four corners of the module **64** to elevate the structural members off of the underlying room floor in the installed state of the interactive floor, whereby resulting gaps between the structural members and underlying room floor to enable routing of necessary wiring from the cells to other control hardware (described further below) via gap spaces between the room floor and the structural members of the base modules.

In the illustrated embodiment, each contact lug **82** is a metallic nut secured against the underside of the floor panel **62** by a respective screw **92** that penetrates vertically through the panel **62** from the topside thereof. Referring to FIGS. **7** and **8**, each panel thus has four such screws **92** residing centrally of the four peripheral regions of the panel **62**. In the fully installed state of the interactive floor **24**, the screws **92** are concealed from sight by perimeter seals **94** that are adhered to the upper faces of the floor panels **62** at the peripheral regions thereof on all four sides of all cells, thereby forming a slightly raised perimeter rim or lip around each cell. With the exception of wall-adjacent perimeter seals installed on outer cells of the interactive floor that neighbour the perimeter walls **12**, **14**, **16**, **18** of the room **10**, each perimeter seal **94** overlaps the floor panels **62** of two neighbouring cells, and is sufficiently wide to cover the peripheral regions of both floor panels of these two cells at the adjacent sides thereof.

A perimeter seal installed at adjacent interior sides of two neighbouring cells of the same module **64** is referred to herein as an inter-cell perimeter seal, while a perimeter seal installed at adjacent exterior sides of two neighbouring cells of two neighbouring base modules **64** is referred to herein an inter-module perimeter seal. Parallel in-line perimeter seals of adjacent cells in one row direction of the array may be seamlessly integral sections of a singular unitary strip **94**A of sealing material, with the parallel inline seals of the other direction being separate individual seals **94**B cut to shorter length to fit between the longer integral seals that run in the other direction of the array. Alternatively, long integral seals may be used in both directions by overlapping the seals at the corners of the cells, though this may be less preferably due to the resulting increased profile height at the points of overlap at the corners of the cells.

In addition to covering the screws **92**, which are preferably counterbored into upper face of the floor panel so as not to create a raised bump in the perimeter seals **94**, the inclusion of perimeter seals **94** creating a slightly raised lip or rim around the individual cells of the interactive floor present other beneficial advantages. Firstly, these rims improve the foot grip for participants walking or running around the room during gameplay, thus denoting notable departure from interactive "dancefloors" of the prior art in which a uniformly planar and continuous floor surface is desired across the entire dancefloor so as not to interfere with sliding foot movement during performance of dance moves. While floor panels **62** with textured upper faces could be used to additionally or alternative improve participant traction on the interactive floor **24**, textured surfaces are more likely to collect dust and grime on the panels themselves **62**, introducing cleaning challenges and reduced light-transmission performance of the illuminable panels **62** when dirtied. Accordingly, the use of smooth, untextured floor panels **62** of purely planar configuration at the upper faces thereof together with the inclusion of a raised perimeter rim or lip around each cell provides balance between provision of adequate foot grip and the cleanliness and optical performance of the panels.

Another benefit is particularly attributable to the inter-module perimeter seals in preferred embodiments where the base modules **64** are not bolted or otherwise fastened to one another, nor fastened down to the underlying room floor. Instead, the base modules **64** are simply laid out side-by-side on the room floor with the adjacent perimeter sides of the base modules **64** in closely adjacent, and preferably abutting, relationship to one another, and the only inter-coupling of the modules **62** to one another is an indirectly coupling thereof by adhered application of the perimeter seals **94** to the floor panels **62** of the modules. The perimeter seals **94**

are made of a flexible material, and thus can be used to accommodate slight variation or non-uniformity in the levelness of the underlying room floor on which the base modules **64** are placed. The flexibility of the adhered perimeter seals can thus cover any subtle gaps between the base modules and their floor panels, and act to smooth the transition between the floor panels **62** of two adjacent modules that might have a slight angular offset between them (i.e. deviating from 100% coplanar relationship with one another) due to variation in the room floor beneath the base modules **64**.

The room **10** is constructed to be of a shape and size making the floor space approximately equal to an integer multiple of the rectangular area possessed by each of the identical base modules **64**, with only a slight extra allowance in each of the room's two dimensions to ensure sufficient clearance during placement of the modules atop the floor space in that that integer quantity. The extra allowance is preferably less than the individual cell width of the modules. As a result, a substantial entirety of the floor space is therefore occupied by the base modules of the installed interactive floor **24**, whereby even though the cells of the different modules are coupled together only by the adhered application of the perimeter seals **94**, separation of the modules from one another is prevented or limited in each horizontal direction of the room by the constraint imposed on the floor-placed modules by the perimeter walls of the room that oppose one another in that direction. This full occupation of the room by the interactive floor **24** imposes mandatory participation in the gameplay by any room occupants, allows quick and easily installation of the interactive floor without bolted or otherwise fastened interconnection of the base modules, and prevents significant separation gaps from opening up between the modules in the event of slight module shifting, due to the constraints imposed by the wall geometry of the room.

Meanwhile, the inter-module perimeter seals cover up any small gaps that may exist between modules due to slight elevational variations in the room floor. Any slight gaps remaining between the placed modules and the room's perimeter walls may be fully partially filled with shims, spacers, or filler material. Like any non-perimeter base modules that don't directly neighbour the perimeter walls of the room, the wall-adjacent modules may also have perimeter seals applied to all perimeter sides thereof, where at the wall-adjacent sides of these modules, the perimeter seal may be adhered to the adjacent room wall, thus covering any gap and shim, spacer or filler between the module and the room wall.

It will be appreciated that the room **10** need not be limited specifically to a purely rectangular shape like that shown in FIGS. **1** to **3**. This is demonstrated in FIGS. **4** and **5**, where an L-shaped room **10'** has two rectangular wings each fully occupied by a respective rectangular grid of cells assembled from the same modules **64** and panels **62** described above. The cell illumination devices and sensing circuits of both grids are individually addressable by the controller in the same manner as for a singular rectangular grid, whereby the two grids collectively form a larger overall room-filling array of interactive floor cells. It will also be appreciated that while the illustrated embodiment employs multi-cell base modules **64**, embodiments with single-cell base modules could likewise benefit from the use of perimeter seals therewith in the above described manner. Where multi-cell base modules are employed, they also need not be limited to



a square 2×2 cell configuration, and may be provided in other cell quantities and non-square rectangular configurations.

FIG. **15** schematically illustrates a room control system **100** of the game room **10**. The room control system **100** features a collection of control hardware **102**, preferably stored in a utility closet **104** situated outside the interior gaming space **106** of the room **10** occupied by the installed interactive floor **24**. In the illustrated embodiment, the control hardware **102** includes one or more local computers **108**, a battery backup **110**, audio control components **112** including at least an audio amplifier, microcontrollers **114**, component PCBs **116**, and power supplies **118** through which the other control hardware components are powered via main power breakers **120** situated further upstream in the facility's electrical system. Based on input commands from the local computer **108** during execution of game-control software installed thereon, the micro-controllers **104** drive the component PCBs of gameplay elements installed within the internal space of the room for interaction therewith by participants during gameplay, which in this case includes the control boards **122** of the interactive floor cells. Accordingly, the control hardware **102** collectively forms a controller that governs automated execution of a gameplay session within the internal space of the game room. The audio control components **112** are connected to one or more loudspeakers **124** likewise installed in the internal space of the game room **10** for playback of game-related audio to the participants during such gameplay, for example verbal commands guiding the participants as to assigned tasks they are to perform during the gameplay session.

The room control system **100** may be one of a plurality of room control systems that are installed among a plurality of respective game rooms in a shared facility, and are networked together over a local area network as part of a larger overall computerized facility management system. Such facility management system may include a facility management server that hosts, or is communicable with, a local participant database for storing participant profiles and associated scoring records of the participants. There may also a central participant database that is hosted remotely of the facility, for example in a cloud server environment, and is communicable with the facility management server via the internet or another wide area network so that participant profiles from the local participant database can be used to populate the central participant database. The facility management servers of additional facilities can thus access and populate the central participant database, whereby a participant can attend multiple facilities and the scoring results from games played at multiple facilities can be compiled together. Further details on the facility management system, and functions of the room control system **100** other than the interactive floor gameplay processes described herein, are disclosed in Applicant's prior U.S. Provisional patent Application No. 62/846,912, filed May 13, 2019, the entirety of which is incorporated herein by reference.

In the illustrated embodiment of the present invention, the game elements operated by the controller **102** include the interactive floor cells **26**; the target devices **28**; and the score/timer display **30** and status display **32**. The controller **102** is configured to enable selective illumination of any one or more of the floor cells **26** in any one of the strip LEDs three colours (Red, Green, Blue) by sending an appropriate illumination command signal to the control board of that cell. Likewise, the controller is configured to monitor for a positive participant-detection output signal from the control board of any of the floor cells in order to recognize when a

participant is present at a given floor cell, as confirmed by the control board's detected closure of one or more of the normally-open switches of that cell's sensing circuit.

Having described the general componentry and layout of the immersive amusement environment **10**, attention is now turned to particularly novel methods of use. FIG. **3** illustrates a snapshot of the room at some point during a gameplay session making use of both the interactive floor **24** and the wall-mounted targets **28**. During gameplay, illumination of the floor panels **62** in three different colours represents three different cell status categories used during gameplay, and thus visually distinguishable to the participants. In a preferred implementation, green panels denote "safe" panels on which participants can stand without penalty, blue panels denote "target" panels that the participants are tasked to physically interact with by exertion of foot-applied downforce thereon (by standing, stepping, jumping or foot-tapping the panel), and red panels denote "hazard panels" that the participants are specifically to avoid stepping on as they traverse the interactive floor to fulfill the assigned tasks of the gameplay session. Since the black and white line drawings do not convey colour content, the different categories of panels are instead represented using different distinguishable symbols. Panels marked with a circle are safe panels, panels marked with a checkmark are target panels, and panels marked with an "X" are hazard panels. Any panels left unmarked are unilluminated "inactive" panels, thus falling into none of the forgoing three gameplay status categories.

In the illustrated scenario, at least one row of safe panels **200** spanning the length of the side wall **18** near the room entrance **20** are illuminated in green, thus denoting a safe starting zone at which newly admitted participants to the room can stand to start the game. Another one or more rows of safe panels **202** spanning the length of the opposing side wall **16** near the room exit **22** are likewise illuminated in green, denoting a safe destination zone for participants to arrive at upon having fully traversed the width of the room from the starting zone.

A first moving hazard zone **204** situated near the safe starting zone **200** comprises a group of four hazard panels that changes over time in a sequential fashion moving across the depth dimension of the room between the opposing front and rear walls **12**, **14** thereof. The figure illustrates time-base variability in the particular member panels of any moving hazard zone by using an unfilled broken line X to show a previously illuminated panel that has since reverted back to a fully darkened (unilluminated) state from a previously illuminated state, a partially filled X to denote a previously illuminated panel whose light source has been more recently deenergized and is thus fading back to its default darkened state, and a fully filled X to denote a currently illuminated panel whose light source is in its energized state in the hazard colour (red). The first moving hazard zone in the illustrated example is a group of four panels in a same singular width-wise row of the interactive floor **24**, and the room snapshot shows the variable group of panels migrating sequentially toward the front of the room on a row-by-row basis.

To achieve this, the controller **102** commands energization of the illumination devices of four cells in the same width-wise row of the cell array in the hazard colour (red) for a brief momentary period, then deenergizes these four cells and energizes a matching next set of four cells in the next width-wise row of the cell array in the hazard colour for another momentary period, and repeats this process serially row-by-row until the latest set of energized hazard panels are in the row nearest the front wall **12** of the room. This sequential activation and deactivation of hazard panels may then be repeated identically, starting from adjacent the rear wall **14** and moving toward the front wall **12** to create a repeating singular-direction sweep of the moving hazard zone **204** across the room depth, or instead repeated in the reverse order back toward the rear wall **14** to create an alternating bi-directional sweep of the moving hazard zone **204** back and forth across the room depth. The energization period for each illumination step may be equal to provide constant-velocity migration of the moving hazard across the room, or the energization period may be varied between different sequential steps to alter the movement velocity and create a greater challenge by reducing predictability of the hazard movement to the participant's trying to avoid contact therewith as they traverse the interactive floor.

A second moving hazard zone **206** situated nearer to the safe destination zone **202** comprises a group of three hazard panels that also changes over time in a sequential fashion moving across the depth dimension of the room, but has its three simultaneously illuminated panels in a same singular depth-wise row of the interactive floor **24**. By comparison with the first moving hazard, this demonstrates that a shared-row set of hazard panels may move in parallel relation along the row they occupy (like the second moving hazard zone **206**), or may move in perpendicular relation to the row they occupy (like the first moving hazard zone **208**). In the case of the second moving hazard zone **206**, instead of energizing and deenergizing the illumination devices of all three cells at the same time, the individual cell at the trailing end of the set in the movement direction is deenergized as a next individual cell in the direction of movement is energized at a leading end of the set, so that the variable group moves incrementally in single-step fashion across the room depth. Once again, the process may be repeated identically to perform a repeating singular-direction sweep of the moving hazard across the room, or repeated in the reverse order to perform an alternating bi-directional sweep of the moving hazard zone back and forth across the room.

Moving hazards need not be limited movement in the depth direction of the room, nor in a direction perpendicular to the participant-tasked travel direction between starting and destination zones. This is demonstrated in the illustrated example by inclusion of a third moving hazard zone **208** which is shown near the front wall **12** of the room, and comprises a group of two hazard panels that also changes over time in a sequential fashion, but moves across the width dimension of the room to be traversed by participants between the designating start and destination zones **200**, **202**. Like the first moving hazard **204**, the panels of this third moving hazard **208** are laid out in a shared row lying perpendicular to the hazard's direction of movement, thought this need not be the case, as demonstrated by the second moving hazard **206**. It will also be appreciated that additional or alternative moving hazards may be composed of a singular changing hazard panel, as opposed to a changing group of multiple hazard panels, and that the direction of movement need not be parallel to a width-wise or depth-wise row of the cell array, and may for example be executed on a diagonal path of the cell array. Also, where a moving hazard is a multi-panel group hazard like those of the illustrated example, the hazard need not be limited to hazard panels in a singular row perpendicular to the direction of movement (like the first or third hazard), or panels in a singular row parallel to the direction of movement (like the second hazard). That is, a hazard may be multiple rows deep

in its direction of movement and multiple rows wide across its direction of movement to create a greater challenge to the participants.

In the illustrated example, two clustered groups of target panels **210**, **212** are illuminated, of which first group of target panels **210** resides between the first and second moving hazard zones **204**, **206** in the width direction of the room between the starting zone **200** and the destination zone **202**, while the second group of target panels **212** resides between the second moving hazard zone **206** and the destination zone **202** in this same width-wise travel direction of the participants. Participants thus must travel from the starting zone **200** to the first group of target panels **210** without stepping on the changing panels of the first or third moving hazard zones **204**, **208**, step on all panels of the first target group **210**, and also reach and step on all panels of the second target group **212**, without stepping on the changing panels of the second or third moving hazard zones **206**, **208**. While the illustrated example features moving hazards, it will be appreciated that non-moving hazards may additionally or alternatively be included in any gameplay scenario, and may include one or more static hazards maintained in a continually illuminated state in the hazard color, and/or one or more blinking hazards whose illumination sources are being repeatedly energized and deenergized to denote switching between hazard status and inactive status, or alternated between illuminated states of different colour (red and blue) to denote switching of the panel between a hazard status and target status.

The wall-mounted targets **28** (wall targets, for short) add an optional extra layer of gameplay interaction to the assigned gameplay task, where the controller **102** also assigns an active status to one or more wall targets **28** that also must be actuated by the participants to successfully complete the task. Preferably, the active status is visually identified to the participants by the controller's energization of an illumination device incorporated into, or aimed at, said wall target **28** so that the active status of that target is visually distinguishable from any inactive target that is either unilluminated, or illuminated in a distinctly different colour from any active wall targets. In FIG. **3**, one target on the rear wall **14** is shown as an illuminated active wall target, as is one target on the side wall **18** at the destination zone **202**.

During gameplay, the controller **102** continually monitors for participant detection signals from any cell **26** currently assigned a hazard or target status, and from any active wall target **28**. In response to detected participant presence on a hazard panel, the controller **102** decrements the current value of the status meter **32** by one life or health point. In response to detected participant presence on a target panel, the controller **102** changes the status of that cell from its previously assigned "target" status to an "inactive" status, and deenergizes that cell's illumination source accordingly so that a participant knows that their actuation of that cell's target panel has been properly recognized when the cell goes dark, denoting that it's no longer an active target. Likewise, detected actuation of a wall target **28** causes the controller **102** to switch that wall target's status to inactive, and to deenergize that target's illumination source (or switch the colour thereof) in order to visually inform the participants of its now inactive status.

FIG. **16** shows one example of a computer-implemented process **300** performed by the controller **102** to carry out a gameplay session in the illustrated game room **10**, where the primary or exclusive gameplay task assigned to the participants is to step on all target panels of the interactive floor **24** and hand-press or otherwise actuate all active wall targets **28**, without stepping on any hazard panels. A gameplay session may involve multiple rounds of play, up to certain predetermined number whose successful completion by the participants denotes winning of the game. From round to round, the particular pattern of hazard and target panels mapped on the interactive floor by the controller **102** is varied based on automated selection from among pre-programmed mapping routines encoded within the game execution software, whose executable statements and instructions are stored in non-transitory computer readable memory of the one or more local computers **108** for execution by one or more processors thereof. With each iteration from one round to the next, the particular mapping routine executed by the controller **102** may vary in any one or more of: the quantity and position of target panels in the interactive floor; the inclusion, omission, quantity and particular selection of wall-mounted targets to accompany the floor-based target panels; the quantity size, shape, position and/or non-moving vs. moving status of the hazard panels; the direction and/or velocity of movement of moving hazards; and/or the constant vs. blinking status of non-moving hazards. Optionally, the complexity of challenge presented may be increased with passing rounds, whether with each individual round, or periodically after a certain number of rounds of relatively similar complexity.

At the first step **302** of the process **300**, the game session is initialized by having the controller **102** load an initial mapping routine from among a selected batch of the pre-programmed routines encoded within the game execution software. Via an electronic sign-in station of the room that is connected to the local computer(s) **108**, as shown in FIG. **15**, the participants may be able select different game options for the given game session prior to initialization thereof, for example to select from among different difficulty levels of escalating value (Level 1, Level 2, Level 3, etc.). To better ensure gameplay does not become predictable to repeat participants, the batch of routines for a game session may be selected randomly from among a larger pool of level-specific routines, optionally with further randomization of the order in which the batched routines are loaded and executed in the gameplay session. The sign-in station preferably resides near the entrance of the room, and preferably outside the room to enable sign-in by waiting participants while current participants are involved in a gameplay session inside, and may be used to govern the admission of participants, for example in the manner described in applicant's aforementioned U.S. provisional patent application incorporated herein.

In preferred embodiments where a gameplay session is a timed session having a predetermined time limit, then at step **304** the controller **102** starts running the timer to countdown the predetermined time limit, and shows the running countdown timer on the score display **30** of the room throughout the duration of the gaming session. Together or concurrently with starting of the timer, the controller **102** illuminates the safe, target and hazard panels in their different colours at step **306** according to the loaded mapping routine, and likewise illuminates any active wall targets likewise dictated by the loaded mapping routine. Instead of being illuminated during initialization of the session, the safe panels may optionally be pre-illuminated in an initial pattern before start of the gameplay session to denote where the participants can safely stand as the first floor map is loaded and initialized.

With the target and hazard panels now illuminated, along with active wall targets if included in the room and assigned by the loaded mapping routine, and with the hazard panels

being varied over time if the currently selected mapping routine includes moving hazards, the controller **102** continually monitors for: expiration of the timer, participant actuation of any blue target panel, participant actuation of any active wall target, and participant actuation of any red hazard panel, as shown respectively at steps **308**, **310**, **312**, **314**. The illumination of the floor panels and wall targets at step **306** may also be accompanied by automated playback of verbal instructions over the loudspeaker **124** to inform the participants that their task is to reach and actuate the target panels and wall targets without touching any of the hazard panels, and optionally to traverse the room to the safe destination zone **202** if this an assigned task of the current round based on the loaded mapping routine. In some embodiments, or in particular rounds or levels, traversal of the interactive floor surface to a particular destination zone may be excluded from the participants' assigned task. In place of such tasked destination, completion of the round may simply require that the participants proceed to any green safe zone, the size and positions of which may vary from the illustrated example that has two isolated safe zones at opposing ends of the room. For example, in one variant, a designated safe zone may span around the full perimeter of the room, and delimit within this full-perimeter safe zone an active playing space within which all hazards and target panels are constrained to allow participants the ability to always step or hop into a nearby safe zone to avoid a given hazard.

If expiration of the timer is detected at step **308**, then this denotes loss of the game by the participant(s), and the controller **102** terminates the game session. Otherwise, the game session continues. If actuation of a blue target panel is detected at step **310**, then at step **316**, the controller **102** changes the mapped status of this panel from a target panel to an inactive panel, and deenergizes the illumination source of the cell accordingly. Likewise, if actuation of an active wall target is detected at step **312**, then at step **318**, the controller **102** changes the mapped status of this wall target **28** from active to inactive, and deenergize the associated illumination source of the wall target accordingly. If actuation of a red hazard panel is detected at step **314**, then at step **320**, the controller **102** decrements the current value of the status meter **32** by one life or health point. In response to this detected actuation of a red hazard panel, the controller checks at step **322** whether the value of the status meter is now zero, denoting loss of all lives or health points, in which case the controller **102** terminates the game session, denoting loss of the game by the participant(s). Otherwise, the game session continues.

At step **324**, the controller checks whether all target panels and active wall targets have been actuated. So long as the controller **102** identifies at least one remaining active target panel or wall target **28** at step **324**, the ongoing monitoring for timer expiration, floor and wall target actuation, and hazard panel actuation continues through repetition of steps **308** to **314**. Once successful actuation of all floor and wall targets is confirmed at step **324**, this can optionally be used to signify successful completion of the current round. However, in the illustrated embodiment, successful round completion is also conditional on arrival of all participants at an appropriate safe zone. Accordingly, with the countdown timer still running, the controller **102** checks at step **326** whether all participants are suitably positioned in one or more safe zones. In instances where the assigned task of the round includes travel to a designated destination zone **202**, step **326** sees the controller **102** query all cells other than those of the designated destination zone **202** for the presence of participants, in which case this query includes the cells of the current round's designated start zone **200**. If no participant detection signal is received from any queried cell, then the controller has positively determined that all participants must be located at the designated destination zone **202**. This destination zone can then be treated as the starting zone of the next round, optionally with the starting zone of the just-completed round then being treated as the destination zone of the next round, though a different destination zone may alternatively be assigned, for example dictated by the mapping routine loaded for that next round. If a full-perimeter safe zone, or one or more generic safe zones, are used in instances where there are no designated start and destination zones, then all cells other than the safe zone(s) are queried at step **326**.

If the controller finds at step **326** that not all participants are within an appropriate safe zone, then at step **328**, the participants are alerted of this need to travel to an appropriate safe zone, for example by automated playback of verbal instruction over the loudspeaker **124**. In the illustrated example, the process returns back to step **308** from step **328**, meaning that the timer keeps running while waiting for the participants to reach an appropriate safe zone, and only once all participants are so located will the current round be concluded at step **326**. In the illustrated embodiment, where scoring is purely timer based, this successful round completion does not trigger any accrual of scoring points to a running score tally. However, in other implementations employing such a tally, successful completion of the round may be correlated to awardal of a predetermined quantity of scoring points, the value of which being dictated by the game control software, in which case, upon positive round completion at step **326**, such scoring points would be accrued to the running score tally maintained by the software during the gameplay session, and optionally updated in real-time on the score display **30**.

In the illustrated embodiment, instead of accruing points, the controller checks at step **330** whether the entire batch of mapping routines for the current gameplay session have been completed. If there is at least one unexecuted mapping routine remaining among the current batch, then the controller **102** prepares for the next round by loading the next mapping routine of the current batch at step **322**, which will govern the floor and wall target illumination pattern during that next round. The process then returns back to step **306** to initiate the next round with the newly loaded mapping routine, and repeats the subsequent steps **308** to **330** over again, either until the gameplay session is terminated by expiration of the timer at step **308** or reduction of the status meter level to zero at step **322**, or until step **330** reveals that all of the batched mapping routines of the current session have been completed, thereby denoting that the participants have won the game. In the event of such a win, then final step **334** sees the controller award points to the scoring record(s) of the participant(s), at least partly based on the remaining value of the countdown timer.

In embodiments, with different user-selectable difficulty levels, instead of solely awarding a timer-based score, the awarded points at step **334** may be the sum of the remaining value of the countdown timer, plus a level-dependent bonus value that is proportional to the user-selected difficulty level. The bonus value may be the multiplication product of a fixed bonus factor and a numerical level identifier. In one example, where each difficulty level is identified by a respective integer value (Level 1, Level 2, Level 3), and the fixed bonus factor is 1000, the bonus value is therefore 1000 for Level 1, 2000 for Level 2, 3000 for Level 3, etc. By

supplementing the timer-based score component with a bonus value proportional to the difficulty level, participants are more likely, or guaranteed, to achieve a greater overall score for completion of a harder level than an easier level, even if the harder level took longer to complete. So using this example, if the countdown timer counts in seconds, with each remaining second being worth one point at the end of the session, a participant who wins a Level 2 gameplay session with only 10-seconds left will earn 2010 points, while a participant who wins a Level 1 gameplay session with 60-seconds left will only earn 1060 points.

It will be appreciated that the countdown timer need not necessarily be measured in seconds. Also, the ratio between the timer value and timer-awarded point value may be varied from the forgoing **1**:**1** example, for example to adjust the relative weight ascribed to the difficulty level vs. the speed of completion. Ascribing a greater point value per second would afford greater weight to the speed of completion, whereby a participant completing a gameplay session at an excessively fast speed at a lower difficulty level would be able to achieve a more closely comparable score to another participant's slower completion of a harder difficulty level.

While the illustrated embodiment contemplates three software-controlled categories of floor panels (safe, targeted and hazard), it will be appreciated an alternative implementation may optionally omit the inclusion of the "safe" and/or "target" category and associated steps of the described methodology, without sacrificing the novelty and inventiveness of a system and method employing the computer-controlled and visually recognizable colour coding of hazard floor panels in a variety of different floor mapping routines. Likewise, the accompanying inclusion of wall-mounted or other more-elevated targets separate from the interactive floor may optionally be omitted without detriment to the patentability of the interactive floor construction and novel methods of interactive floor use, though the inclusion of such more-elevated targets is beneficial to introduce greater variety and challenge, where participants must remain visually aware of both ground-level hazards and targets for foot-based actuation, and additional elevated targets requiring hand-based or other upper body actuation.

It will also be appreciated that the particular gaming session described with relation to FIG. **15** is presented purely as a non-limiting example, and that the novel and inventive use of an interactive floor system to create a combination of tasked targets and penalized hazards, and the novel details of the unique floor assembly and cooper able room configuration, may be employed in variety of different interactive game implementations, whether alone or in combination with other game or amusement componentry.

Since various modifications can be made in my invention as herein above described, and many apparently widely different embodiments of same made, it is intended that all matter contained in the accompanying specification shall be interpreted as illustrative only and not in a limiting sense.

The invention claimed is:

**1**. An amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein:

the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;

trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence;

the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants of one or more targets, of which the participants are tasked with actuation to successfully complete said gameplay sequence; and

said one or more targets comprise one or more target devices that are separate and distinct from the panels of the interactive floor system.

**2**. The amusement system of claim **1** wherein said one or more targets also comprise a second subset of one or more panels that are each designated as a target panel to be stepped on by said participants, and the controller is configured to trigger illumination of each target panel by the illumination system in a manner distinguishable from all other panels of the array, including the hazard panels; and to monitor for said actuation of the one or more targets, at least in part, by monitoring output from the sensing system for actuation of each target panel.

**3**. The amusement system of claim **2** wherein the controller is configured to designate a third subset of the panels as safe panels to which the participants are to travel after actuation of all designated targets to denote participant completion of the gameplay sequence, and to trigger illumination of the safe panels via the illumination system in a manner distinguishable from all other panels of the array, including the hazard and target panels.

**4**. The amusement system of claim **1** wherein said one or more target devices are mounted in elevated relation above said panels of the interactive floor system.

**5**. The amusement system of claim **1** wherein said one or more target devices comprise at least one wall-mounted target device mounted on at least one upright wall neighbouring the array of panels.

**6**. The amusement system of claim **5** wherein said interactive floor system resides in an enclosed room having an interior space delimited by a plurality of perimeter walls spanning around the array of the panels, and the at least one wall-mounted target device is mounted to at least one of said perimeter walls.

**7**. The amusement system of claim **1** wherein the controller is configured to, during said gameplay sequence, vary the subset of panels that are designated and distinctly

illuminated as said hazard panels, and to accordingly vary which of the panels are monitored for detected participant presence.

**8**. The amusement system of claim **1** wherein the array of panels reside in an enclosed room, and a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

**9**. An amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein:

the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;

trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence; and

the controller is configured to designate another subset of the panels as safe panels to which the participants are to travel in a final completion step of the gameplay sequence, and to trigger illumination of the safe panels via the illumination system in a manner distinguishable from all other panels of the array, including said hazard panels.

**10**. The amusement system of claim **9** wherein the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants of one or more targets, of which the participants are tasked with actuation to successfully complete said gameplay sequence.

**11**. The amusement system of claim **10** wherein said one or more targets comprise a second subset of one or more panels that are each designated as a target panel to be stepped on by said participants, and the controller is configured to trigger illumination of each target panel by the illumination system in a manner distinguishable from all other panels of the array, including the hazard panels; and to monitor for said actuation of the one or more targets, at least in part, by monitoring output from the sensing system for actuation of each target panel.

**12**. The amusement system of claim **9** wherein the controller is configured to, during said gameplay sequence, vary the subset of panels that are designated and distinctly illuminated as said hazard panels, and to accordingly vary which of the panels are monitored for detected participant presence.

**13**. The amusement system of claim **9** wherein the array of panels reside in an enclosed room, and a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

**14**. An amusement system comprising:

an interactive floor system comprising:

an array of panels laid out in one or more grids with the panels of each grid lying at generally equal elevation in generally coplanar relation to one another to collectively define respective areas of an interactive floor surface;

an illumination system operable to individually illuminate each panel of the array independently of any other panel of the array; and

a sensing system operable to detect presence of any participant atop any panel of the array, independently of whether presence of a participant is detected on any other panel in the array;

a controller connected to the illumination and sensing systems and configured to send illumination command signals to the illumination system to change illuminated statuses of the panels of the array, and to receive detection signals from the sensing system denoting detected presence of participants on the panels of the array;

wherein:

the controller is configured to execute a gameplay sequence, and to execute the following steps therein:

designate a subset of the panels as hazard panels to be avoided by participants;

trigger illumination of the hazard panels by the illumination system in a manner distinguishable from all other panels of the array;

monitor for detected participant presence on any of the hazard panels; and

in response to detected participant presence on any hazard panel, trigger execution of a penalty step in said gameplay sequence; and

the controller is configured to, during said gameplay sequence:

vary the subset of panels that are designated and distinctly illuminated as said hazard panels, and to accordingly vary which of the panels are monitored for detected participant presence; and

generate at least one moving hazard by sequentially illuminating then de-illuminating an individual panel, or group of panels, in serial fashion across the array.

**15**. The amusement system of claim **14** wherein the controller is configured to generate multiple moving hazards, of which at least two moving hazards are each executed by sequential illumination and de-illumination of a respective set of one or more panels in serial fashion in a different respective direction across the array.

**16**. The amusement system of claim **14** wherein the controller is configured to maintain a gameplay score tally and/or gameplay status meter, and to attribute a penalty thereto in response to detected participant presence on any of the hazard panels.

**17**. The amusement system of claim **14** wherein the controller is further configured to, throughout the gameplay sequence, monitor for detected actuation by the participants

of one or more targets, of which the participants are tasked with actuation to successfully complete said gameplay sequence.

**18**. The amusement system of claim **17** wherein said one or more targets comprise a second subset of one or more panels that are each designated as a target panel to be stepped on by said participants, and the controller is configured to trigger illumination of each target panel by the illumination system in a manner distinguishable from all other panels of the array, including the hazard panels; and to monitor for said actuation of the one or more targets, at least in part, by monitoring output from the sensing system for actuation of each target panel.

**19**. The amusement system of claim **18** wherein the controller is configured to designate a third subset of the panels as safe panels to which the participants are to travel after actuation of all designated targets to denote participant completion of the gameplay sequence, and to trigger illumination of the safe panels via the illumination system in a manner distinguishable from all other panels of the array, including the hazard and target panels.

**20**. The amusement system of claim **14** wherein the array of panels reside in an enclosed room, and a floor space of said room is spanned in substantial entirety by said array of panels in at least a first direction measured between a first pair of opposing walls of said room.

* * * * *